Veronica Burns **LUCAS, Don Alvaro Leon, John Paul Lucas, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 91–42C.**

United States Claims Court.

Feb. 14, 1992.

Robert D. Sokolove and David A. Slacter, Chevy Chase, Md., for plaintiffs.

Patrick W. Johnson, Washington, D.C., with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, for defendant. Richard P. White, U.S. Army Corps of Engineers, Baltimore, Md., of counsel.

## MEMORANDUM OPINION

LYDON, Senior Judge:

This government contract case is before the court on the motion of defendant to dismiss plaintiffs' complaint for lack of jurisdiction, or alternatively, a motion for summary judgment. Plaintiffs oppose both motions. After careful consideration of the parties' submissions, oral argument having been held on January 23, 1992, the court denies defendant's motion to dismiss but grants defendant's motion for summary judgment.

## FACTS

Plaintiffs (Veronica Burns Lucas, Don Alvaro Leon, and John Paul Lucas) are a three-member team of licensed architects and landscape architects who are all faculty members at Pennsylvania State University. The team is known collectively as Burns Lucas, Leon, and Lucas Architects (BL3). On June 1, 1989, plaintiffs won a contest sponsored by the American Battle Monuments Commission (ABMC) to design a memorial for Korean War veterans.[1] Winning the contest sowed the seeds for this litigation.

The ABMC is a federal commission which is responsible for commemorating, through battle monuments, the services of the American Armed Forces since World War I. 36 U.S.C. §§ 121 *et seq.* On October 28, 1986, Congress enacted legislation to construct a memorial on the National Mall in Washington, D.C. to honor veterans of the Korean War. Pub.L No. 99–572, 100 Stat. 3226 (1986). The memorial was to be located on a seven and one-half acre tract of the Mall known as Ash Woods, which is near the Lincoln Memorial and across the Reflecting Pool from the Vietnam Veterans Memorial. The legislation also created the Korean War Veterans Memorial Advisory Board (Advisory Board), consisting of twelve distinguished veterans of the Korean War appointed by the President. The Advisory Board's responsibilities included selecting a site and a design for the memorial, promoting the establishment of the memorial, and raising private funds for its construction and maintenance. This legislation charges the ABMC with the responsibility for establishing the memorial. The legislation also provides that the memorial is to be established in accordance with the National Capital Memorials and Commemorative Works Act, 40 U.S.C. § 1001 *et seq.* (Supp.1988) (Commemorative Works Act). Under the Commemorative Works Act, the Fine Arts Commission, the National Capital Planning Commission (NCPC), and, on be-

half of the Secretary of the Interior, the National Capital Memorial Commission must approve the final design of the Korean War Veterans Memorial. *See* 40 U.S.C. § 1008(a). In accordance with its statutory authority, the ABMC retained the U.S. Army Corps of Engineers (Corps) to act as its agent in the design and construction of the memorial.

In 1989, the ABMC, the Corps, and the Advisory Board (the agencies) sponsored a single stage national competition for the design of the proposed Korean War Veterans Memorial.[2] The competition was not required by the authorizing statute. The competition was the mechanism chosen by the Advisory Board and the ABMC to find a design. The Advisory Board and the ABMC executed a Memorandum of Understanding in March 1988, in which they outlined their respective responsibilities, among other things, design selection. This memorandum did not mention any role by the Advisory Board in design modification. The Corps administered the design competition, distributed the design program, and received the competition entries. Pursuant to the competition rules, the winning design was to be selected by a "jury" consisting of the twelve members of the Advisory Board. The jury was to be assisted by an advisory panel of professional consultants who would advise the jury in their respective areas of expertise: architecture, landscape architecture, sculpture, fine arts, critics and curators. The competition rules required that all interested participants were to register by January 23, 1989. On January 30, 1989, all registered competitors were to be sent a complete design program containing all pertinent information. The deadline for submitting design entries was May 1, 1989, and an announcement of winners was scheduled for June 1, 1989.

The competition rules provided that the ABMC "shall retain ownership and right to use all prize winning designs for the purpose intended," and that the ABMC was

---

**1.** The Korean War began on June 25, 1950, and ended on July 27, 1953.

**2.** The ABMC, the Corps, and the Advisory Board are referred to as "agencies" throughout this

opinion. However, it is unclear whether these entities as a group are "executive agencies" for statutory purposes. *See infra* note 5.

entitled, for adequate remuneration, to use selected features from any design submitted by the losers in the competition. *See* Competition Rule 9. The rules further required that the winning design must, by law, be approved by the ABMC, the Secretary of the Interior, the Commission on Fine Arts, and the National Capital Planning Commission (hereinafter collectively referred to as Review Commissions). *See* Competition Rule 3.5. In the "unlikely event that the winning design is disapproved by any of [the Review Commissions], and the design cannot be altered to be acceptable and receive approval, then the second place design will be considered for approval and realization of the design. In such an event, the original winning design will be awarded the first prize cash award, and the design receiving full approval will also receive a first prize cash award." Competition Rule 3.6. The rules awarded a prize of $20,000 for first place, or, in the case of full approval of the second place design, a second $20,000 would be awarded.

In addition, the rules state:

It is anticipated that the winner of the design competition will be retained in a consultant capacity with the [architectural/engineering] firm selected by the [Corps] to realize the design. The winning Individual Competitor or Competitor Team agrees to enter into good faith negotiations with the [architectural/engineering] firm to develop a mutually acceptable contract for consultant services. In the unlikely event that such negotiations fail to develop a mutually acceptable contract, [the ABMC] shall have the right to designate whomever it may wish to provide such consultant services.
Competition Rule 10.1

In the event of a dispute, the rules provide for an administrative dispute resolution procedure: "Any dispute or question of interpretation arising under these Rules shall be considered by the [Corps], the [ABMC], and the [Advisory Board] in con-sultation with the Professional Adviser, who shall render a decision in writing, which will be distributed to all parties concerned." Competition Rule 12.2. The rules clearly state that all competitors, by signing their registration forms, "certify that they have read the Design Competition Description and Rules and that they agree to be bound by them." Competition Rule 2.4.

In accordance with the registration deadline, BL3 submitted an entry in a timely fashion and on May 23, 1989, was notified that its design had won first prize in the competition over a field of 540 entries.[3] Plaintiffs received the first prize award of $20,000 in cash. The winners of the design competition were publicly announced on June 1, 1989. The winning design envisioned a platoon size military unit passing from a zone of peace on the west, up a slight incline through a war zone, to its objective, the American flag in another area of peace. The military unit consisted of 30 stone figures, representing the combined elements of all branches of the Armed Forces that served in Korea. The design purportedly represented a passage through time and a reflection of the war, rather than an actual battle. On June 14, 1989, BL3 presented a model of their winning design to the ABMC. Later that day, President Bush unveiled the model of BL3's design in a public ceremony at the White House. Thereafter, plaintiffs' design was presented to the Review Commissions for review and approval. During June, July, and August of 1989, all of the Review Commissions gave preliminary approval for plaintiffs' design, subject to various reservations. A significant number of comments were generated during the review process which had to be addressed in further development of the design.

On June 22, 1989, the Corps published an announcement for the services of an architectural/engineering (A/E) firm for design and implementation studies for the memorial. Cooper–Lecky Associates P.C. (CLA)

**3.** Plaintiffs' complaint, paragraph 13, alleges that 540 competitors entered the competition. Defendant admits this in its answer.

was selected over nine other firms, based on its qualifications that included service as architect of record on the Vietnam War Veteran's Memorial. Plaintiffs had competed for the A/E contract by teaming with Saski Associates but were ranked third by the Corps due to their small size and inexperience with large public projects. On October 13, 1989, CLA was notified that it had been chosen to receive the A/E contract for the memorial.

Thereafter, plaintiffs negotiated with CLA for a consulting contract relative to the design project. On May 15, 1990, plaintiffs entered into a contract with CLA, in the amount of $42,500 plus travel and meetings, to furnish consulting services for implementation of the design project. Although not clear from the materials at hand, it would appear that the contract estimated total fees of $54,930. In addition, it was "anticipated" that there would be additional work not currently included in the contract which would generate further and additional consultant fees for BL3. Under the contract, BL3 agreed not to converse with the press, the Corps, or other consultants relative to the design of the project. BL3 also agreed not to discuss their design with any of the Review Commissions.

Throughout most of 1990, the agencies and CLA continued to refine and develop the design concept. In May of 1990, CLA met with Charles Atherton of the Commission of Fine Arts, who indicated that the Commission had many unresolved concerns regarding the design project. It would appear that the Commissions had differing views regarding the winning design. To meet these concerns, CLA developed four alternative schemes, known as the Bridge, the Overlook, the Delta, and the Valley schemes. In July of 1990, the ABMC selected the Delta scheme as the best approach to solve the concerns of the Review Commissions. CLA further developed the Delta scheme and incorporated it into a

development work book for the agencies and Review Commissions. The work book suggested three alternatives, designated as "Delta Scheme," "Delta Scheme 3.1," and "Delta Scheme 3.2." On August 20, 1990, the ABMC selected Delta Scheme 3.2 as the most promising design to meet the commission's objectives.

On August 27, 1990, BL3 sent CLA a letter rejecting the Delta scheme. They complained that the Delta scheme so altered plaintiffs' design as to constitute a completely new design. Plaintiffs challenged the right of CLA to work on any design concept except their own. Since they won the design competition, plaintiffs believed that only their design could be the focal point of CLA's work and any modification must meet their approval. BL3 also complained that CLA excluded them from the design process and requested that CLA return to the task for which they were retained, i.e., developing contract documents for the original design with the aid and consultation of BL3. CLA rejected this request. It would also appear that plaintiffs balked at performing any design consulting work for CLA which they felt detracted significantly from their award winning design. This attitude created friction between CLA and plaintiffs. Throughout the next few months, CLA offered the Delta Scheme to the various agencies for approval. On October 1, 1990, CLA presented the Delta Scheme to the National Park Service (Department of the Interior) without giving BL3 prior notice of the meeting. Later that month, on October 23, 1990, the Advisory Board and the ABMC formally approved CLA's Delta Scheme. On November 8, 1990, the National Capital Memorial Commission (NCMC) also approved the Delta Scheme but refused BL3's request to present the original design with refinements.[4] Finally, on December 13, 1990, CLA presented the Delta Scheme to the Commission on Fine Arts for approval. Thereafter, the Commission gave BL3 an

---

4. Section 1007 of the National Capital Memorials and Commemorative Works Act (Commemorative Works Act), 40 U.S.C. § 1001 *et seq.,* requires that the ABMC consult with the NCMC concerning the site of the memorial and the work to be done. Section 1008 requires the approval of the Commission of Fine Arts and the National Capital Planning Commission before a construction permit can be issued.

opportunity to present the developments of its design which they felt met the concerns of the various agencies and boards. After BL3's presentation, the Commission on Fine Arts noted that CLA's design was a departure from the original design and reserved voting on approval of said design.

On January 16, 1991, BL3 filed the present action for breach of contract against defendant. Plaintiffs allege that the design competition constitutes a unilateral contract which became binding when plaintiffs' design was selected as the winner. Plaintiffs contend that the competition rules provide two options, once the winning design is chosen. The agencies can either implement the winning design with alterations or modifications, if necessary to obtain approval from the Review Commissions, or abandon the winning design in favor of the second place design. Plaintiffs charge that the agencies have chosen a third option. Rather than electing either choice permitted by the rules, they have substituted a design of their own choosing. In plaintiffs' view the Advisory Board went beyond its delegated authority and violated plaintiffs' rights under the contract. As a result of the alleged breach, plaintiffs claim that if their design is not implemented, they will be damaged by loss of "good will, professional prestige and renown." In addition, plaintiffs claim damage from the "loss of revenue it would otherwise have received as a result of its contract with CLA in providing consulting services for implementation of the winning design. Plaintiffs seek damages in an unspecified sum "in excess of $250,000."

On December 24, 1990, plaintiffs filed a separate suit in federal District Court for the District of Columbia against the agencies and CLA. After the federal defendants moved to dismiss plaintiffs' first amended complaint, plaintiffs filed a motion to amend their complaint. Plaintiffs also voluntarily dismissed Count 3 in their first amended complaint, which sought damages against the Advisory Board. On May 20, 1991, the district court granted plaintiffs' motion to amend their first amended complaint. Plaintiffs' district court complaint contains three counts. Two counts seek damages against CLA, and one count seeks injunctive relief against all defendants. Jurisdiction for the suit against the federal defendants is based on section 702 of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*[5] In their second amended complaint, plaintiffs allege that the federal defendants violated both the design competition rules and the laws upon which the rules are based, that is, Public Law No. 99–572 and the National Capital Memorials and Commemorative Works Act (Commemorative Works Act), 40 U.S.C. § 1001 *et seq.*

In a Memorandum Opinion dated October 24, 1991, the District Court dismissed the suit against the federal defendant agencies. *See Lucas, et al v. United States Army Corps of Engineers, et al,* No. 90–3072, 1991 WL 229941 (D.D.C. Oct. 24, 1991). The court understands the District Court ruling is, or will be, the subject of appeal to the Court of Appeal for the District of Columbia Circuit.

### DISCUSSION

#### I

In plaintiffs' view, the design competition constituted a unilateral contract which was accepted by plaintiffs when they submitted an entry in the competition. Since the court's jurisdiction extends to "express or implied contracts with the United States," 28 U.S.C. § 1491, plaintiffs believe they are properly in this court. An express contract " 'must be manifested by words, either oral or written, which contains agreement and/or mutual assent.' " *Essen Mall Properties v. United States,* 21 Cl.Ct. 430, 439 (1990) (quoting *Webster University v. United States,* 20 Cl.Ct. 429, 433 (1990)).

The basic elements of contract formation are offer and acceptance. *Essen*

5. Section 702 provides, in pertinent part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof."

*Mall,* 21 Cl.Ct. at 439; *Restatement (Second) of Contracts* § 22 (1981). An "offer" is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Restatement (Second) of Contracts* § 24. An offer is accepted by "manifestation of assent to the terms thereof made by the offeree in a manner invited by the offer." *Restatement (Second) of Contracts* § 50. In a situation such as a contest or competition, "[w]here an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it." *Simmons v. United States,* 308 F.2d 160, 164 (4th Cir. 1962); Restatement (Second) of Contracts § 45. Such an offer is often referred to as an "offer for a unilateral contract. Typical illustrations are found in offers of rewards or prizes...." *Restatement (Second) of Contracts* § 45 comment a.

■ The process of contract formation in a contest or competition has been described as follows. "The offer of a prize for the performance of a specified act in a contest ... constitutes the first part of the normal offer-acceptance consideration equation for the formation of an enforceable contract. By competing in the contest, a competition accepts the offer; by performing the specified act required for winning the contest, he provides the necessary consideration." *National Amateur Bowlers, Inc. v. Tassos,* 715 F.Supp. 323, 325 (D.Kan.1989). Stated in more general terms, "[t]he offer by one party of specified compensation for the performance of a certain act as a proposition to all persons who may accept and comply with its conditions constitutes a promise by the offeror. The performance of that act is the consideration for the promise. The result is an enforceable contract." 14 *Williston on Contracts* § 1666 (3d ed. 1972).

■ In holding that prize money won in a musical competition was taxable as gross income, the Supreme Court stated: "In the legal sense payment of a prize to a winner of a contest is the discharge of a contractual obligation. The acceptance by the contestants of the offer tendered by the sponsor of the contest creates an enforceable contract." *Robertson v. United States,* 343 U.S. 711, 713, 72 S.Ct. 994, 996, 96 L.Ed. 1237 (1952) (citing 6A *Corbin on Contracts* § 1489; *Restatement of Contracts* § 521 (1932)); *accord United States v. Amirikian,* 197 F.2d 442, 443 (4th Cir. 1952); *see also Chenard v. Marcel Motors,* 387 A.2d 596, 601 (Me.1978) (promise to give new car to golfer who shot hole in one in golf tournament constituted offer for unilateral contract that was accepted when plaintiff shot hole in one). The materials before the court indicate that a contract was formed between the agencies sponsoring the competition and each of the competitors when the competitors accepted the offer embodied in the design competition by submitting entries. When the agencies chose plaintiffs' design as the winner of the competition, the agencies were contractually obligated to pay plaintiffs the $20,000 first place cash prize. Plaintiffs have been paid the $20,000 for their prize winning design entry. Without more, it would appear that this payment of the money to plaintiffs, the winner of the contest or competition, resulted in the discharge of any contractual obligation. *See Robertson,* 343 U.S. at 713, 72 S.Ct. at 996.

Plaintiffs, however, claim that the contractual obligation of the defendant under the competition rules was not restricted solely to the $20,000 prize money. Under plaintiffs' reading of the competition rules, defendants were "obligated to use the plaintiffs' award winning design as the basis for construction of the Korean War Memorial." Plaintiffs concede that the winning design was subject to approval by various entities, that alterations or modifications to this design might have to be made in order to obtain approval, and that if sufficient alterations or modifications to the design could not be accomplished so as to obtain the necessary approvals, their winning design could be abandoned in favor of the design of the second place finisher in the competition.

Plaintiffs contend that the design submitted for approval to the various entities has been so altered or modified that it constitutes a totally new design and thus constitutes an abandonment of their winning design. Under these circumstances, the competition rules require that the second place design be submitted for approval. Plaintiffs charge that instead, CLA and others (the Advisory Board, the Corps and the ABMC) have developed a design of their own choosing, abandoning plaintiffs' design completely, and have presented it to the proper entities for approval. Plaintiffs allege that these actions, breached the competition rules and provide the basis for plaintiffs' breach of contract action in this court.[6]

Defendant's motion to dismiss plaintiffs' complaint is based on the contention that the court lacks jurisdiction to consider plaintiffs' claim. First, defendant argues that 28 U.S.C. § 1500 prevents the court from exercising jurisdiction in this case. Second, defendant maintains that the claim at issue is governed by the Contract Disputes Act (CDA). 41 U.S.C. § 601 *et seq.* Therefore, plaintiffs' failure to comply with certain requirements of the CDA, *i.e.*, claim presentation and certification, precludes jurisdiction in this court over the claim advanced by plaintiffs.

## A.  28 U.S.C. § 1500

Under 28 U.S.C. § 1500, the court's jurisdiction under the Tucker Act is limited as follows:

> The United States Claims Court shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending · in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

Defendant alleges that, under section 1500, the court may not exercise jurisdiction over plaintiffs' complaint because plaintiffs have a suit, which was filed approximately three weeks before the present suit, presently pending in the Court of Appeals for the District of Columbia.

When a prior suit in district court remains pending, this court must determine whether its jurisdiction to hear the present claim is barred by 28 U.S.C. § 1500. *Tecon Engineers, Inc. v. United States*, 170 Ct. Cl. 389, 343 F.2d 943 (1965), *cert. den.*, 382 U.S. 976, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966); *accord Clark v. United States*, 19 Cl.Ct. 220, 222 (1990). In *Johns–Manville Corp. v. United States*, 855 F.2d 1556 (Fed. Cir.1988), *cert. den.*, 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989), the Federal Circuit stated that the term "claim" in section 1500 refers to the assertion of the same operative facts. *Johns–Manville Corp.*, 855 F.2d at 1559–64.

Defendant contends that both the present action ·and the action pending before the district court share the same operative facts. The court does not agree. For example, plaintiffs' suit in district court alleges, inter alia, breach of contract against CLA, based on a contract for consulting services for implementation of plaintiffs' winning design. Plaintiffs' suit in this court alleges breach of contract against the federal agencies, based on an express contract arising from the design competition. These are two entirely separate contracts with distinct terms and purposes. The materials before the court indicate that, while the two breach of contract claims may be supported by some common operative facts, the material facts supporting each claim are largely dissimilar. Thus, it appears that the two actions do not share the same operative facts.

Moreover, as defendant acknowledges, the Federal Circuit is currently in the process of reconsidering the application of

---

**6.** There is uncertainty in the materials before the court whether the design of the Korean War Memorial has been officially approved by all the appropriate entities sufficient to enable the Corps of Engineers to commence building the project. It may well be that plaintiffs' claim herein may be premature. Further, it is not known whether, or if, consideration has been, or will be, given to adoption of the design of the second place design winner.

section 1500 en banc. *UNR Industries, Inc. v. United States*, 926 F.2d 1109 (Fed. Cir.1990). Specifically, the Federal Circuit is considering both whether *Tecon* should be overruled and whether the court should overturn the rule announced in *Johns–Manville* for determining the meaning of "claim" in section 1500. If the Federal Circuit overturns the present method for determining a "claim," it will announce a new rule. In light of the unsettled nature of the law in this area, the court is not willing to conclude, on the basis of the materials before the court, that the pendency of plaintiffs' suit in district court is sufficient, under section 1500, to deprive this court of jurisdiction. Further, the District Court in its Memorandum Opinion, referred to previously, refused to address any contractual claim by plaintiffs against the federal defendants, viewing such claims as beyond the scope of the lawsuit in the District Court. The issue, involving the federal defendants in the District Court, was whether the federal defendants exceeded their statutory authority in making design changes to plaintiffs' winning design. Plaintiffs had argued before the District Court that the design scheme submitted for approval by the ABMC to the appropriate entities constituted a completely new design and thus violated the Commemorative Works Act and the Korean War Memorial Act, Public Law No. 99–572, 100 Stat. 3226 (1986). The District Court rejected this statutory argument raised by plaintiffs and thus dismissed the claim as to the federal defendants. Accordingly, this court rejects defendant's section 1500 argument.

**B.  The Contract Disputes Act (CDA)**

██  The parties disagree as to whether plaintiffs' contract claim, set forth in their complaint, is subject to the CDA. If the claim is subject to the CDA, then the court would be without jurisdiction to hear the claim because plaintiffs did not comply with certain jurisdictional requirements, *i.e.*, submission of a claim for decision by a contracting officer and claim certification. Plaintiffs argue that this type of contract design competition for a prize or award is not subject to the CDA because policy considerations relating to cost and competition are not involved. Defendant, on the other hand, contends that the contract on which plaintiffs premise their claim falls within the purview of the CDA.

The CDA applies to "any express or implied contract ... entered into by an executive agency for ... the procurement of services."[7]  41 U.S.C. § 602(a)(3). Although plaintiffs contend that a unilateral contract was formed, they urge the court to find that this "is precisely the type of contract not subject to the CDA." Plaintiffs, relying on *Pasteur v. United States*, 814 F.2d 624 (Fed.Cir.1987), emphasize that the policy reasons behind the CDA, relating to cost and competition, have no application to a contest such as this one. In *Pasteur*, the United States Court of Appeals for the Federal Circuit held that the CDA did not apply. The primary function of the pleaded contracts between Institut Pasteur and the National Cancer Institute was facilitation of the transfer of research materials among scientists engaged in a collaborative research effort and not the procurement of property or services. *See Id.* at 628. The court in *Pasteur* emphasized the collaborative research effort of the two parties and noted the lack of a buyer-seller relationship. *Id.  See also Busby School of*

---

**7.**  The federal defendants involved in this litigation are the ABMC, the Army Corps of Engineers, and the Advisory Board. Neither party addresses the question of whether these entities are "executive agencies" within the meaning of the CDA. The notes accompanying section 601 of the CDA state that the term "executive agency" includes the executive departments, independent establishments, military departments, the U.S. Postal Service, and wholly-owned government corporations.  41 U.S.C.A. § 601 historical and statutory notes (1987).

Under section 102 of Title 5, the Department of the Army is a "military department." Thus, it appears that the Army Corps of Engineers is within the definition of "executive agency." Section 104 of Title 5 defines "independent establishment" to mean an establishment in the executive branch which is not an executive department, a military department, or a government corporation. Thus, it appears that the ABMC and the Advisory Board may be "independent establishments" and therefore "executive agencies" within the meaning of the CDA.

*Northern Cheyenne Tribe v. United States,* 8 Cl.Ct. 596, 600 (1985) (contracts between Bureau of Indian Affairs and Indian Reservation Districts not procurement oriented contracts but grant or sociological type contracts not subject to CDA.).

However, defendant contends that, while the design competition is "not a conventional procurement contract, such a contract still falls squarely within the parameters of the CDA," because it is clearly "one for the procurement of services," specifically design concepts for the Korean War Veterans Memorial. The government, by awarding 18 awards in exchange for design concepts, qualifies as a buyer, while the designer is the seller. Contrary to the situation in *Pasteur,* defendant argues, the government was expending funds for a service. In its reply brief, the government notes that "[i]ndeed, it would appear that the unrestricted design competition engendered greater competition than would have existed under the traditional bid solicitation process." Moreover, defendant argues the procurement regulations provide for this type of procurement process and cites the following sections:

Acquisition of architect-engineer services in accordance with the procedures in this subpart will constitute a competitive procedure.

48 C.F.R. Chap. 1 § 36.601–2.

When the use of *design competition* is approved by the agency head or a designee, agencies may evaluate firms on the basis of conceptual design of the project. Design competition may be used when—

(1) *Unique situations exist involving prestige projects, such as the. design of memorials and structures of unusual national significance;*

48 C.F.R. Chap. 1 § 36.602–1 (emphasis added)

Defendant's argument, however, misses the point. Its contention would certainly be valid if CLA were suing here for pro-curement of Architect–Engineer Services. However, the contract underscoring the claim at bar is a design competition. No services are called for. The court is of the view that competing in a contest and winning the same may well serve to create a contract, but such a contract does not constitute procurement covered by the CDA.

## II

■ Assuming the court has jurisdiction over plaintiffs' claim, defendant argues that plaintiffs have failed to exhaust available administrative remedies, and thus they have failed to state a claim on which relief can be granted.[8] If, as plaintiffs contend, an implied in fact contract was formed between the agencies sponsoring the competition and each of the competitors, then plaintiffs' contract rights are limited by the rules of the competition, which are the terms of the contract. *National Amateur Bowlers,* 715 F.Supp. at 325. Thus, by submitting a design, the contestants agreed to abide by the rules of the design competition. *See* Competition Rule 2.4. *National Amateur Bowlers,* 715 F.Supp. at 325. These rules include Competition Rule 12.2, which provides an administrative procedure for dispute resolution. "Any dispute or question of interpretation arising under these Rules shall be considered by the [Corps], the [ABMC], and the [Advisory Board] in consultation with the Professional Adviser, who shall render a decision in writing, which will be distributed to all parties concerned."

Plaintiffs do not deny that they never resorted to this administrative dispute resolution mechanism before filing suit. However, they claim that they understood Rule 12.2 to apply only to questions arising during the actual competition. It is plaintiffs contention that the Advisory Board's function to act as a jury and the Professional Advisor's role overall both ceased to exist after the competition was over. Accordingly, plaintiffs continue, the administrative

---

8. In its brief, defendant frames his argument that plaintiffs' claims should be dismissed for failure to pursue and exhaust the dispute resolution procedures as a jurisdictional argument. At oral argument, government's counsel agreed with the court that this was not a jurisdictional argument but rather an argument for failure to state a claim on which relief can be granted. *See Omni Moving & Storage of Virginia, Inc. v. United States,* 21 Cl.Ct. 224, 230 (1990).

disputes mechanism expired after the competition was completed and a winner selected. Plaintiffs believe the competition documents are silent, or at best confusing, as to what administrative steps a disgruntled party must take after the selection of a competition winner. Therefore, plaintiffs contend that they can not be faulted for not seeking relief administratively.

The government, on the other hand, argues that this disputes clause also applies to disputes arising after the competition precisely because the drafters did not limit the clause to disputes during the competition. According to defendant, the language is clear. To the extent that the rules apply to post-competition events, so too does the disputes clause. It is clear from the context of the rules that some rules pertain exclusively to circumstances arising after the competition. For example, section nine, entitled "Ownership and Use of Designs," relates to the competitors' and the government's respective rights over the submitted design concepts as those rights exist after the competition. In fact, the very rule that is at the heart of plaintiffs' complaint concerns post competition events. Plaintiffs claim the agencies were bound by the rules to either implement plaintiffs' design in the memorial project, or reject it in favor of the second place winner. According to plaintiffs, defendant's failure to do so has resulted in the alleged damages. *See* Competition Rule 3.6

In a competition, rules provide the basis for the terms of the parties' agreement. When parties to a contract have agreed on a method to resolve disputes through specified administrative procedures, courts generally have required adherence to the terms of the agreement. *Crown Coat Front Co. v. United States,* 386 U.S. 503, 512–13, 87 S.Ct. 1177, 1182–83, 18 L.Ed.2d 256 (1967); *United States v. Blair,* 321 U.S. 730, 735–37, 64 S.Ct. 820, 88 L.Ed. 1039 (1944); *Kihlberg v. United States,* 97 U.S. 398, 401–02, 24 L.Ed. 1106 (1878); *Schlesinger v. United States,* 181 Ct.Cl. 21, 27, 383 F.2d 1004, 1007 (1967) (exhaustion of administrative remedies is *sine qua non* of court's contract jurisdiction). Plaintiffs

generally must pursue and exhaust the dispute resolution procedures specified in their contract before seeking judicial relief. *Crown Coat,* 386 U.S. at 512, 87 S.Ct. at 1182; *United States v. Anthony Grace & Sons, Inc.,* 384 U.S. 424, 429, 86 S.Ct. 1539, 1542, 16 L.Ed.2d 662 (1966); *Zidell Explorations, Inc. v. United States,* 192 Ct.Cl. 331, 334, 427 F.2d 735, 737 (1970). In holding that a contractor's failure to exhaust the administrative appeal provisions in its contracts barred recovery in the Court of Claims, the Supreme Court, some years back, explained the rationale for this rule:

> [A disputes clause] is a clear, unambiguous provision applicable at all times and binding on all parties to the contract. No Court is justified in disregarding its letter or spirit.... It creates a mechanism whereby adjustments may be made and errors corrected on an administrative level, thereby permitting the Government to mitigate or avoid large damage claims that might otherwise be created. *United States v. Blair,* 321 U.S. 730, 735 [64 S.Ct. 820, 822, 88 L.Ed. 1039] ... And in the absence of some clear evidence that the appeal procedure is inadequate or unavailable, that procedure must be pursued and exhausted before a contractor can be heard to complain in a court.

*United States v. Joseph A. Holpuch Co.,* 328 U.S. 234, 239–40, 66 S.Ct. 1000, 1003, 90 L.Ed. 1192 (1946). Thus, plaintiffs must follow the dispute resolution procedure specified in the competition rules, unless the disputes procedure is unclear or ambiguous.

The disputes procedure outlined in the competition rules is not viewed as clear and unambiguous. To be sure, the "disputes" provision is not the standard clause to be found in federal procurement contracts and governing federal procurement regulations. It does not put the resolution process in the hands of one agency acting through one contracting officer but places resolution in the hands of three entities who are to consult with the "Professional Advisor." As drafted, there exists uncertainty as to whom the plaintiffs should address a dispute of the kind asserted in their complaint.

Further, there is uncertainty as to whether the disputes mechanism applies after the competition is completed. For example, the Professional Advisor, whose duties and responsibilities are set forth in the competition rules, seems to be available only for competition purposes and has no specified post competition responsibilities. *See* Competition Rule 4. Further, the competition rules state that the Professional Advisor was to "oversee management of the Competition." Finally, in the communications provision of the rules it provides, "communications regarding the competition are to be made solely through the [Corps] by mail and addressed [to] the Korean War Veterans Memorial Design Competition." Competition Rule 6.1. While one may now conclude, on reflection, that arguably the provision covers post competition events, this fact does not detract from the view that the provision is unclear or ambiguous. Looking at the provision from a contractor's viewpoint at the time, it is not unreasonable to view the disputes provision at issue as less than clear and as somewhat ambiguous. As indicated above, only a "clear and unambiguous [disputes] provision" is binding on the parties to a contract. Under the unique circumstances of this case, it would be unreasonable to charge plaintiffs with failure to exhaust available administrative remedies when the relevant provision was unclear and ambiguous as to whether post competition claims were covered by the provision, and it was

unclear as to whom such a claim should be addressed.

### III

Defendant has moved for summary judgment. For purposes of this motion defendant has conceded that plaintiffs have a contract on which relief could be granted but argues the relief sought by plaintiffs cannot be granted by the court.[9] Plaintiffs oppose the summary judgment motion on the ground there are material facts in issue which serve to preclude the granting of said motion. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).[10] Since, for the purposes of their motion, defendant concedes liability, there are no material facts in issue on the liability issue. Plaintiffs suggest that defendant's motion is more akin to a motion to dismiss under Rule 12(b)(4) for failure to state a claim upon which relief can be granted. That is true but since defendant has attached matters outside the pleadings to its motion, under Rule 12(b), the matter can be, and is, treated as one for summary judgment. Accordingly, the court will now consider whether, as a matter of law, plaintiffs would be entitled to recover on the damages claimed, assuming *arguendo*, entitlement.

Plaintiffs, in their complaint, claim they "will be damaged if its [their] design is not

---

9. Plaintiffs contend that the defendant agencies, *i.e.*, the ABMC, the Corps, and the Advisory Board breached the competition rules. The design competition rules, plaintiffs argue, constitute a contract between plaintiffs and the agencies. Plaintiffs aver that as winner of the competition, defendant agencies "were obligated to use their [plaintiffs'] design as a basis for construction of the Korean War Veterans Memorial" (Complaint, par. 39). Plaintiffs further aver that the contract provides that if their design could not be altered or modified so as to receive approval by the designated Commissions, then their design could be abandoned and the design of the second place winner in the competition would be considered. The breach of contract occurred when defendant agencies abandoned plaintiffs' design in favor of a design of the agencies' own choosing, which was not entered in the competition.

10. Plaintiffs claim, and rightly so, that there is a dispute of fact as to whether the alterations or modifications were so significant as to constitute an abandonment of plaintiffs' design. However, as a preliminary matter, the question of whether plaintiffs had any right in their design after the competition was over, even as the winner of the competition, seems to rest on an interpretation of the contract, which, as is recognized, is a question of law, not a question of fact. *See* in this regard Competition Rule 9, which includes, in part, "the Commission shall retain ownership and right to use all prize winning designs for the purpose intended." Under these rules, it would appear that plaintiffs, as winner of the competition, only have "an opportunity to review and comment on the development and realization of the design." *See* Competition Rule 10.4.

implemented on the National Mall," (Complaint, Par. 43). They seek damages for loss of good will, professional prestige and renown of being associated with the design of the Korean War Veterans Memorial on the National Mall. They also seek damages through "loss of revenue," they would otherwise have received as a result of their independent contract with CLA in providing consulting services for implementation of its winning design.

Plaintiffs' claim of damages for loss of goodwill, professional prestige, and renown sets forth, essentially, a claim for damages for defamation. Plaintiffs' "loss of revenue" claim, *i.e.*, revenue it would have received on another contract is essentially a claim for tortious interference by defendant agencies with plaintiffs' contract with CLA.[11] Defamation claims and tortious interference claims are essentially tort claims. *See Hicks v. United States*, 23 Cl.Ct. 647, 652–653 (1991).

■ Jurisdiction in this court is limited to claims "not sounding in tort." 28 U.S.C. § 1491(a)(1). Loss of business reputation is not a compensable damage claim in the Claims Court because it sounds in tort and is speculative. *Essen Mall*, 21 Cl.Ct. at 447. Such tort claims are beyond the court's jurisdiction. *See Frawley v. United States*, 14 Cl.Ct. 766, 767 (1988) (claim for damage to reputation sounds in tort over which court lacks jurisdiction); *Pinkston v. United States*, 6 Cl.Ct. 263, 267 (1984); *Berdick v. United States*, 222 Ct. Cl. 94, 100, 612 F.2d 533, 536 (1979) (claims for damages for defamation, intentional infliction of emotional distress, tortious interference with business relationships, and conspiracy sound in tort and are not within court's jurisdiction); *Somali Development Bank v. United States*, 205 Ct.Cl. 741, 749, 508 F.2d 817, 821 (1974).

■ To the extent that plaintiffs' allegations of loss of business reputation and loss of business revenue do not sound in tort, these allegations seek consequential damages for breach of contract that are

not recoverable because they are unforeseeable, remote, and speculative. The court may award only actual damages for breach of contract and only for the natural and probable consequences of the breach asserted. *Ramsey v. United States*, 121 Ct.Cl. 426, 433, 101 F.Supp. 353 (1951), *cert. den.*, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952). Damages for harm to business reputation and loss of future profits are not recoverable because they are too remote, consequential, and speculative. *Essen Mall*, 21 Cl.Ct. at 447; *Rhen v. United States*, 17 Cl.Ct. 140, 143–44 (1989); *William Green Constr. Co. v. United States*, 201 Ct.Cl. 616, 626–27, 477 F.2d 930, 936–37 (1973), *cert. den.*, 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974). Remote, unforeseeable, and consequential damages are not recoverable. *Mendenhall v. United States*, 20 Cl.Ct. 78, 85 (1990); *Begay v. United States*, 16 Cl.Ct. 107, 134 (1987); *Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 886–87, 524 F.2d 707, 720 (1975), *cert. den.*, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976).

■ The only damages that are recoverable for breach of contract are those that are foreseeable at the time of the making of the contract, not at the time of the breach. *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 545–47, 23 S.Ct. 754, 756–57, 47 L.Ed. 1171 (1903); *Restatement of Contracts* §§ 330, 331; 11 *Williston on Contracts* §§ 1356, 1357 (3d ed. 1967). Contrary to plaintiffs' assertion, plaintiffs' estimated damages of $37,995, resulting from the unpaid balance of plaintiffs' contract with CLA, are not recoverable. When the parties entered into the unilateral contract, based on the competition, the loss of revenue on the CLA contract was not foreseeable damage. At that time, neither the government nor CLA were under an obligation to enter into a contract with plaintiffs. "For a damage to be direct there must appear no intervening incident ... [and] the cause must produce the effect inevitably and naturally, not pos-

---

11. In Par. 43 of its complaint, plaintiffs allege that they "will be forever associated with the sham and fraud of a misleading competition which was simply used as an artifice and a device to implement the design views of a minority."

sibly nor even probably." *Ramsey*, 121 Ct.Cl. at 433, 101 F.Supp. 353. Damages for lost business opportunities are not recoverable. *Solar Turbines, Inc. v. United States*, 23 Cl.Ct. 142, 159–60 (1991); *William Green Construction*, 201 Ct.Cl. at 626, 477 F.2d at 936–37; *Olin Jones Sand Co.*, 225 Ct.Cl. 741, 742 (1980).[12]

Moreover, it is important to bear in mind that plaintiffs' contract with CLA was independent of the Competition Rules contract. The Competition Rules alluded to the anticipation of the winner of the design competition being awarded a consulting contract but stressed that whether the winner received such a contract depended on whether the winner could negotiate such a contract with the A/E (architect/engineer) selected by the agencies to develop and realize a design acceptable to the designated Commissions. It must be remembered that the competition here at issue was not required by statute and no statute nor contract provision required defendant agencies to select or work with only a design based on competition results. Indeed, the competition process seems to be a reasonable method of selecting a design by choosing a preliminary design from a contest and thereafter working from that to develop a final design.

Plaintiffs do not, in their brief, persuade the court that the precedential value of the above cited cases is zero because the case at bar does not fall into the pattern of the cited cases which involve standard commercial settings. According to plaintiffs, there is no relationship between the $20,000 price paid and the product received. Plaintiffs aver that they spent much more than $20,000 in working out their design. Plaintiffs contend they did not enter into the competition for the money but rather for the honor, prestige and recognition that goes with winning a competition "to have one's design built on the National Mall." (Plaintiffs' brief p. 22). They entered the competition, plaintiffs allege, for "the financial remuneration such honor and prestige brings to the winners." The above cited cases demonstrate clearly that damages based on these incentives are not recoverable.

## IV

One final word deserves mention at this time. There is uncertainty in the court's mind whether a final design has been approved by all the designated Commissions. The papers accompanying the submissions of the parties suggest that the Commissions disapproved the Delta design scheme. However, at oral argument there was an indication that the Commissions have approved a final design. This matter is up in the air as far as the court is concerned. If there has been no final approval of the design then plaintiffs' suit may well be premature. If plaintiffs' design is still under consideration then obviously plaintiffs' claim has not yet matured. Plaintiffs do not dispute the fact that a final and realized design must be approved by designated Commissions. Until such approval is forthcoming and final, there would be no basis on which to proceed and consider plaintiffs' claim. "Where 'action with reference to the contract to be executed be-

12. After winning the competition, plaintiffs negotiated with CLA for a consultant contract relative to realization of a design that would receive the approval of the designated Commissions. Plaintiffs allege this independent contract provided that plaintiffs would be paid some $42,000, which figure, plaintiffs advise, was later revised upward to $54,930. Plaintiffs allege that after performing services worth $16,935, which amount plaintiffs concede was paid to them by CLA, CLA directed BL3 to suspend work on plaintiffs' design. Defendant's agents, the ABMC, the Corps, and the Advisory Board insisted that a new design scheme was necessary in order to obtain approval from the designated Commissions. Thereafter, plaintiffs ostensibly refused to perform any consulting services on the new design, their design having been abandoned. Since they performed no service thereafter, CLA did not pay them the remaining $37,995 ($54,930 − $16,935). Plaintiffs seek to recover this "lost revenue" of $37,995. Plaintiffs have sued CLA in the District Court suit, presumably this $37,995 may well be a damage item in that suit. Whether 28 U.S.C. § 1500 is applicable in this regard is an open question at this time. *See* Part I A, *supra*. Since plaintiffs seek to recover an amount in excess of $250,000 for both damage claims, the amount of the defamation claim presumably is in excess of $212,000.

**312**

tween the parties is subject to approval by another and that approval is not subsequently given, no binding contract exists on which the United States may be required to respond in damages as for a breach.'" *Wells v. United States,* 199 Ct.Cl. 324, 337, 463 F.2d 434, 441 (1972) *(citing Ship Construction Co. v. United States,* 91 Ct.Cl. 419, 462 (1940)). Further, if plaintiffs' design is abandoned or rejected, in whole or in part, and the design of the second winner in the contest is considered and accepted, then plaintiffs seem to agree that their claims, in whole or in part, are subject to rejection. At this stage, there is a possibility that plaintiffs' claims may be premature.

## V

On the basis of the above discussion, defendant's motion to dismiss plaintiffs' complaint for lack of jurisdiction and for failure to exhaust available administrative remedies is denied. Defendant's motion to dismiss the complaint for failure to state a claim on which relief can be awarded is granted. Accordingly, the clerk is directed to dismiss the complaint. No costs.