**Dr. Ben BRANCH, Trustee of Bank of New England Corp., derivatively on behalf and in the name of Maine National Bank, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–133C.

United States Court of Federal Claims.

Oct. 20, 1993.

William F. Sheehan, Washington, DC, for plaintiff. Peter J. Spiro, Shea & Gardner, of counsel.

Joan M. Bernott, Washington, DC, with whom was Asst. Atty. General Frank W. Hunger, for defendant. Thomas A.

Schultz, Robert G. Clark, and Wendy B. Kloner, F.D.I.C., of counsel.

### *ORDER*

NETTESHEIM, Judge.

This case comes before the court on defendant's motion under RCFC 12(b)(1) to dismiss for lack of subject matter jurisdiction. Defendant claims that the court lacks jurisdiction over plaintiff's complaint pursuant to 28 U.S.C. § 1500 (1988), which precludes the Court of Federal Claims from having jurisdiction over any claim based on the same operative facts as a suit filed in another federal court. Plaintiff has opposed and argument is deemed unnecessary.

### FACTS

The following facts are undisputed, unless otherwise noted. Dr. Ben Branch ("plaintiff") is the Chapter 7 Trustee of the Estate of the Bank of New England Corporation ("BNEC"). Plaintiff brings this claim derivatively on behalf of Maine National Bank ("MNB"), a wholly owned subsidiary of BNEC.

Prior to bankruptcy, BNEC was a bank holding company which owned three subsidiary banks: Bank of New England, N.A. ("BNE"); Maine National Bank; and Connecticut Bank and Trust Company, N.A. ("CBT"). In the late 1980's, MNB and CBT maintained healthy account balances and were considered to be in good financial health.

This was not the case with their sister bank, BNE. From 1986 BNE suffered financial problems as a result of management problems and a risky loan portfolio. BNE's credit rating and asset quality deteriorated until the bank was effectively insolvent by the summer of 1989. Regulatory agencies such as the Federal Deposit Insurance Corporation ("FDIC"), the Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve ("Board of Governors") and the Federal Reserve Bank of Boston (referred to as "the regulators" unless discussed individually) became increasingly involved in managing BNE's affairs. From September of 1989, the regulators played a substantial role in managing BNE's operations and supervising its business transactions. Despite BNE's grave problems, the bank was allowed to stay open while attempts were made to stabilize the bank by transferring substantial assets to it from BNE's parent company, BNEC.

These efforts were unsuccessful. On January 3, 1991, BNEC's management met with the OCC in Washington and told them that BNE's capital accounts were exhausted. Newspapers reported on January 4 and 5, 1991, that the expected losses for the fourth quarter of 1990 for the parent company, BNEC, exceeded $450 million as a result of BNE's problems, and that BNEC was in grave financial trouble. This news created a crisis of confidence among depositors and started a run on accounts at BNE and CBT.

On January 6, 1991, the OCC declared all of BNEC and its three subsidiary banks to be insolvent and appointed the Federal Deposit Insurance Corporation (the "FDIC") as their receiver. On January 7, 1991, BNEC filed for bankruptcy. This bankruptcy is credited as being one of the largest bank holding company failures in American history.

When BNEC's bankruptcy was announced January 6, 1991, MNB was closed and the FDIC was appointed as receiver. That same day the FDIC issued a notice of Assessment of Liability against MNB under the cross guarantee provision of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). Under FIRREA, 12 U.S.C. § 1815(e) (Supp. IV 1992), an insured bank in a commonly-owned system is liable to reimburse the FDIC for any loss at a sister bank.[1] The

---

1. 12 U.S.C. § 1815(e)(1)(A) specifies:

    Any insured depository institution shall be liable for any loss incurred by the Corporation, or any loss which the Corporation reasonably anticipates incurring, after the date of the enactment of August 9, 1989 in connection with—

    (i) the default of a commonly controlled insured depository institution; or

notice requested that MNB immediately pay the whole of the $1,015,900,000.00 shortfall in the FDIC's deposit insurance fund caused by BNEC's insolvency. MNB could not comply and filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code. This bankruptcy is currently pending in the United States Bankruptcy Court for the District of Massachusetts.

Plaintiff has challenged the regulator's actions before, during, and after BNEC's bankruptcy in several lawsuits. In each of these suits plaintiff claims that Government actions wrongfully deprived BNEC's shareholders of valuable assets.[2]

On January 13, 1992, plaintiff filed three actions which subsequently have been consolidated and are currently pending in the United States District Court for the District of Massachusetts. *Branch v. FDIC, et al.*, Nos. 92–10091–Y, 92–10807–Y, 92–10904–Y (D.Mass., filed Jan. 13, 1992). The complaints seek to recover BNEC assets that were alleged to have been fraudulently transferred to its subsidiary banks prior to BNEC's bankruptcy.

Defendants in the action are the FDIC as receiver for the three failed banks, MNB, BNE, and CBT; and the Fleet Banks, which purchased most of the failed banks' assets and liabilities. Upon MNB's, BNE's, and CBT's closure, the FDIC was named receiver for each of them and took possession of the BNEC assets that were transferred to those banks.

The suits that followed seek to recover BNEC's assets from the BNE, CBT, and MNB receiverships; from the Bridge Bank receiverships, which continued the operation of the banks until they were sold; and from the Fleet Banks. Plaintiff sued the FDIC as receiver of BNE, CBT, and MNB, along with the successor Fleet Banks, in federal court in Massachusetts, Connecticut, and Maine. The Connecticut and Maine suits were transferred to and consolidated with the Massachusetts action. A fourth claim was brought by plaintiff against the receiverships of the three Bridge Banks. This claim was filed subsequent to the other three suits because of the requirements of FIRREA. It was originally filed in the District of Columbia and then transferred to and consolidated with the suits in Massachusetts.

The four consolidated lawsuits make no claim relating to the assessment. The action refers specifically to the assessment only once in the complaint; paragraph 48(c) alleges that, "to force the closure of MNB, the FDIC demanded payment by MNB of $1 billion (the FDIC's then estimated loss as receiver for BNE) under an improper claim of authority allegedly granted to the FDIC under 12 U.S.C. § 1815(c)."

## DISCUSSION

If a suit based on the same claim has been filed in another court, 28 U.S.C. § 1500 prohibits the Court of Federal Claims from having jurisdiction over an action on the same claim. The "same claim" has been interpreted as a claim sharing a common core of operative facts as the suit filed in this court. *UNR Indus., Inc. v. United States*, 962 F.2d 1013 (Fed. Cir.1992) (en banc), *aff'd sub nom. Keene Corp. v. United States*, —— U.S. ——, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). This policy relieves the Government from defending the same case in two courts at the same time. *Dwyer v. United States*, 7 Cl.Ct. 565, 567 (1985).

In determining whether a suit is actually based on the "same claim", this court examines the operative facts, necessarily considering governmental conduct challenged in each case, rather than theories of law presented. *Johns–Manville Corp. v. United States*, 855 F.2d 1556,

(ii) any assistance provided by the Corporation to any commonly controlled insured depository institution in danger of default.

**2.** Plaintiff specifically challenged the assessment against MNB during administrative hearings before the FDIC. The FDIC Board of Directors held against plaintiff on all nonconstitutional claims. *In re Maine Nat'l Bank*, FDIC–91–100kk (FDIC Bd. Dir. Apr. 28, 1992). Administrative Law Judge James L. Rose ruled on July 8, 1991, that a constitutional challenge was not appropriate for decision in an administrative proceeding.

1562–63 (Fed.Cir.1988), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989); *Gaubert v. United States,* 28 Fed. Cl. 597, 599–601 (1993). Claims involving the same general factual circumstances, but distinct material facts can fail to trigger section 1500. In *Lucas v. United States,* 25 Cl.Ct. 298 (1992), winners of a competition to design a war memorial brought action against the Government alleging breach of contract. The Claims Court did not dismiss the action pursuant to section 1500, despite the fact that plaintiffs had filed a separate suit in federal district court against the government agencies involved and the engineering firm alleging breach of contract for implementation of the design. While the two breach of contract claims may be supported by some common operative facts, the material facts supporting each claim were characterized as largely dissimilar. 25 Cl.Ct. at 305. Similarly, in *Cherokee Nation of Oklahoma v. United States,* 21 Cl.Ct. 565 (1990), the Cherokee Nation's district court action arising out of the construction of a river navigation system did not involve the same claim as an action challenging the Government's alleged breach of statutory and fiduciary duties by failure to survey tribal lands, failure to evict trespassers, and general mismanagement.

■ Plaintiff maintains that the consolidated federal district court suits in Massachusetts do not call for application of section 1500 with respect to the instant action because the suits are not based on the same claim. Plaintiff contends that the claim in this case focuses exclusively on the assessment of MNB, thereby involving completely different operative facts and arising from discrete government actions in contrast to the Massachusetts suits, which seek to recover BNEC assets transferred to BNE.

Defendant argues that the suits are based on the same operative facts, asserting that plaintiff may not substitute the word "same" for the statute's phrase "for or in respect to" in comparing the two suits. Defendant points out that section 1500 explicitly nullifies jurisdiction over "any claim for or in respect to which the plaintiff ... has pending in any other court any suit or process." Defendant rejects plaintiff's argument that the court should ascertain whether the governmental conduct complained of is different. Although plaintiff does make this argument, the court resolves the matter based on whether the operative facts underlying the claims differ.

Defendant argues that plaintiff cannot distinguish his case from *Gaubert.* In *Gaubert* this court stated that "[p]laintiff's loss of the Cedar Lane property and the loss of his equity in IASA are part of a continuum of events which started with the Investex merger in 1984 and ended with IASA's [Independent American Savings Association] insolvency in 1986...." 28 Fed. Cl. at 600. The court held that plaintiff's $75 million claim before the Court of Federal Claims and plaintiff's $25 million claim pending in the Fifth Circuit were based on the same grievance, and, therefore, the same operative facts. Plaintiff's $75 million claim was to recover his equity in IASA upon insolvency. Plaintiff's $25 million claim was based on losses upon insolvency incurred by guaranteeing IASA's net worth during a neutralization period by transferring to IASA his personal interest in Cedar Lane. Both claims were to recover losses stemming from alleged regulatory malfeasance resulting in IASA's insolvency, thereby requiring the same material facts as a predicate for both disputes.

The present action may be differentiated from *Gaubert.* The Massachusetts suits, while mentioning the assessment in the complaint, make no claim specifically relating to the assessment. The FDIC never defended against any claim relating to the assessment. Defendant points out that Judge Young, in his 82-page denial of FDIC's motion to dismiss, addresses the assessment three times in his opinion. Once again, the mention of the assessment relates to general factual circumstances, as opposed to any direct claim made by plaintiff. *Gaubert* found plaintiff's claim to be part of a continuum of events with the regulators' alleged wrongdoing diffuse and

intricately woven throughout the claims. *See* 28 Fed.Cl. at 600. While this characterization can be applied to the case at bar, *Gaubert* also faulted plaintiff for his inability to separate his claims as discrete transactions and described the facts of the claims as common, interrelated, and ultimately unseverable. *Id.* In the Massachusetts suits, plaintiff challenges the fraudulent transfer of BNEC assets to its subsidiary banks. The present claim involving the assessment of MNB implicates a later event, the 12 U.S.C. § 1815(e) authorized taking for which plaintiff seeks compensation. This assessment claim relates to a specific, discrete event and involves underlying facts that are severable from those of the Massachusetts suits.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss for lack of jurisdiction is denied.

**IT IS SO ORDERED.**