CIENEGA GARDENS, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 94–1C.

United States Court of Federal Claims.

April 29, 1997.

Everett C. Johnson, Jr., Washington, D.C., with whom were Susan S. Azad and Vivian C. Strache, Los Angeles, CA, for plaintiffs.

John E. Kosloske, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger and David M. Cohen of the U.S. Department of Justice and Kathleen

## DAMAGES OPINION

ROBINSON, Judge:

The issue before the court is the precise measure of damages to which plaintiffs are entitled. This Opinion shall be read in conjunction with the court's March 25, 1995 Opinion on liability, *Cienega Gardens v. United States,* 33 Fed.Cl. 196 (1995) ("*Cienega I* "), in which the court held that: (1) plaintiffs have established privity of contract between themselves and the government; (2) the Department of Housing and Urban Development ("HUD" or "the agency") was authorized to enter into enforceable contracts with plaintiffs; and (3) defendant breached its contracts with plaintiffs.

While *Cienega I* set forth the court's analysis in finding breach of contract [1], the factual record then before the court contained insufficient evidence for the court to assess damages. For that reason, trial was necessary to develop the constellation of facts regarding the contract claim for the purpose of quantifying damages. This damages trial was held in the National Courts Building, Washington, D.C. on November 18–21, 1996. Following trial, the parties filed simultaneous post-trial briefs on January 17, 1997, discussing further their respective theories on the accounting issues. Finally, the court conducted a site visit on February 7, 1997, in the presence of counsel to clarify matters impacting market rate determinations of the four model properties that remained unclear following trial and the filing of the post-trial briefs. After careful consideration of the arguments, testimony, exhibits, and applicable law, the court concludes that plaintiffs are entitled to damages in the amount of $3,061,107 for the four model properties.

### Background

During the 1950s and 1960s, Congress enacted legislation to encourage private developers to construct, own and manage housing projects for low- and moderate-income fami-

---

1. Having found breach of contract and the need for trial on damages, the court denied defendant's motion to dismiss and plaintiffs' cross-motion for partial summary judgment on the alternate Fifth Amendment takings issue.

lies. To implement the legislation, Congress authorized first the Federal Housing Administration and later HUD [2] to provide mortgage insurance to enable private lending institutions to provide low-interest mortgages to housing developers.

Housing developers received financial incentives along with mortgage insurance under either of two programs. The first, referred to as "Section 221," provided for below-market mortgage rates. Pub.L. 83–560, 68 Stat. 590, 599 (1954), *amended by* Pub.L. 87–70, '75 Stat. 149 (1961). Developers who obtained mortgages after 1968, however, were subject to a new provision enacted that year known as "Section 236." Developers who participated in the Section 236 program received market-rate mortgages with an interest subsidy. Pub.L. 90–448, 82 Stat. 498, 499 (1968). In either case, developers were expected to pass on these financial benefits to their tenants in the form of lower rents. *Id.*

Plaintiffs [3] are owned by real estate partnerships bearing names corresponding to the properties. Created under the laws of California, each of these partnerships developed and operated low-income rental housing projects with mortgage loans insured pursuant to section 221(d)(3) or section 236 of the National Housing Act, codified as amended at 12 U.S.C. §§ 1715*l*(d)(3), 1715z–1 (1994). Each of these properties has been managed from inception by Goldrich & Kest ("CG & K") Management Co., Inc. or by its predecessor, a property management firm wherein Jona Goldrich and Sol Kest held a controlling interest. G & K is among the most experienced California-based management companies with one of the largest HUD portfolios of owned and operated properties.

Typically, when a developer received a HUD-insured mortgage under one of these programs, the developer signed a long-term deed of trust note [4] with a private lender. HUD would then endorse the note. In 1970–1972, each of the four partnerships executed 40–year deed of trust notes: Sherman in the amount of $1,703,000 in favor of United California Bank; Independence in the amount of $1,134,900 in favor of Union Bank; St. Andrews in the amount of $3,181,600 in favor of Union Bank; and Pico in the amount of $700,900 in favor of Prestige Mortgage Corporation. All of these lenders are HUD-approved mortgagees. Each of these deed of trust notes bore a "Rider A" agreement. Rider A to the Sherman deed of trust note provided in relevant part that:

> The debt evidenced by this Deed of Trust Note may not be prepaid in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner, except a maker which is a limited distribution mortgagor may prepay without such approval after twenty (20) years from the date of final endorsement of this Deed of Trust Note by the Federal Housing Commissioner.

Rider A to the Independence, St. Andrews, and Pico deed of trust notes provided in relevant part that:

> The debt evidenced by this Deed of Trust Note may not be prepaid, either in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner, except where: (1) the prepayment is in connection with the release of an individual unit for sale to a lower income, elderly, or handicapped person; or (2) the Maker is a

---

**2.** In 1965, the Federal Housing Administration, headed by the Federal Housing Commissioner, was subsumed into the newly established Department of Housing and Urban Development. *See* 24 C.F.R. §§ 200.1–200.4 (1994).

**3.** To promote judicial economy and conserve the parties' resources, defendant and the 42 plaintiffs selected four "model plaintiffs" for the purposes of litigating the damages trial. They are as follows: (1) the Sherman partnership owns Sherman Park Apartments (135 units); (2) the Independence partnership owns Independence Park

Apartments (78 units); (3) the St. Andrews partnership owns St. Andrews Gardens Apartments (192 units); and (4) the Pico partnership owns Pico Plaza Apartments (42 units), which was added as a "new plaintiff" by the First Amended Complaint.

**4.** This Opinion, for the sake of convenience, uses the terms "mortgage" and "deed of trust note" interchangeably, although the court is aware of their distinctions, which are rooted in state law. *See* BLACK'S LAW DICTIONARY 373 (5th ed.1979).

limited distribution mortgagor which is not receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of twenty (20) years from the date of final endorsement of this Deed of Trust Note by the Commissioner or as a result of a sale of the project to a cooperative or nonprofit corporation or association and the purchase is financed with a mortgage insured pursuant to Section 236(j)(3) of the National Housing Act as amended.

Simultaneously, the developers entered into "regulatory agreements" with HUD, which placed certain conditions on the mortgages. The regulatory agreements imposed restrictions on the operation of the projects, including: the income levels of tenants; the rents that could be charged; and the rates of return that the developer could receive (collectively "affordability restrictions"). The regulatory agreements imposed upon the owners several additional obligations, including a requirement to make all mortgage payments to lenders when due and to maintain substantial cash reserves—obligations which were designed to limit the government's financial exposure under its insurance contract.[5] The regulatory agreements, as well as the mortgage insurance provided by HUM, were to remain in effect as long as the mortgage loan remained outstanding.

While the regulatory agreement made no mention of the owner's prepayment rights, Rider A to the HUD-endorsed deed of trust notes expressly prohibited prepayment of the

mortgages before 20 years from the date of endorsement, except under certain conditions which included HUD approval of the prepayment. The notes further stated that, after making payments for 20 years, owners could prepay their mortgages in fill without prior HUD approval. The deed of trust notes were printed on forms approved by HUD. The prepayment rules as set forth in the notes reflected contemporaneous HUD regulations, 24 C.F.R. §§ 221.524(a)(1)(ii) and 236.30(a)(i) (1970),[6] which govern Section 221 and Section 236 programs. Those regulations also contained language which generally reserved to HUD the right to make future amendments:

§ 221.749 Effect of Amendments.

The regulations in this subpart may be amended by the Commissioner at any time, and from time to time, in whole or in part, but such amendment will not adversely affect the interests of a mortgagee or lender under the contract of insurance on any mortgage or loan already insured and shall not adversely affect the interests of a mortgagee or lender on any mortgage or loan to be insured on which the Commissioner has made a commitment to insure.

§ 221.524 Prepayment privileges.

(a) *Prepayment in full—(1) Without prior Commissioner consent.* A mortgage indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner . . .

5. Plaintiffs also draw the court's attention to paragraph 12 of the regulatory agreement, which effectively placed a lien on the mortgaged property in favor of HUD:

[T]o secure the Commissioner because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Commissioner their rights to the rents, profits, income and charges of whatever sort which they might receive or be entitled to receive from the operation of the mortgaged property.... Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits,

income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

6. The language in the Section 221 regulations regarding mortgage prepayment was essentially the same as that in the Section 236 regulations, which in pertinent part stated:

§ 236.30 Prepayment privileges.
(a) *Prepayment in full—(1) Without prior Commissioner consent.* A mortgage indebtedness maybe prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner where....
(ii) [T]he prepayment occurs after the expiration of 20 years from the date of final endorsement of the mortgage....

24 C.F.R. § 221.524(a)(ii)(1970). All of the plaintiffs in this case are general or limited partnerships who are owner-participants in the Section 221 or Section 236 programs. The housing projects they own are all located in Los Angeles, CA. The original prepayment dates and existing mortgage balances as of the corresponding prepayment dates were: $1,343,461 for Sherman on September 12, 1992; $910,407 for Independence on June 11, 1993; $2,986,682 for St. Andrews on December 19, 1991; and $560,860 for Pico on December 27, 1993. To this day, none of the owners has prepaid. HUD approved insurance on almost the entire amount of the deed of trust notes pursuant to Sections 221(d)(3) and 236 of the National Housing Act. The amounts and dates of final HUD endorsement were: $1,582,900 for Sherman on September 13, 1972; $1,129,400 for Independence on June 12, 1973; $3,181,600 for St. Andrews on December 20, 1971; and $698,400 for Pico on December 28, 1973.

By the late 1980s, Congress became concerned that a large number of owners might take advantage of the prepayment clauses within a short period of time, thus drastically reducing the supply of low-income rental housing throughout the country. *See* S.REP. No. 316, 101st Cong., 2d Sess. 105, reprinted in 1990 U.S.C.C.A.N. 5763, 5867. As a re-

sult, Congress enacted two pieces of legislation to directly counter the threat of massive prepayments. The first bill, the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA" or "Title II") was enacted in 1987. Pub.L. 100–242, 101 Stat. 1877, *reprinted* as amended at 12 U.S.C.A. § 1715*l* (note) (West 1989). ELIHPA effectively placed a two-year moratorium on prepayments in order to give Congress breathing room with which to devise a permanent solution. *Id.* § 221(b). While it did not prohibit prepayments altogether, ELIHPA did require owners to apply to HUD for permission to prepay. *Id.* § 222. ELIHPA authorized HUD to approve a prepayment only after making written findings that the prepayment would have minimal effects on the existing tenants, the local low-income housing market in general, and the local housing market for minorities. *Id.* § 225.[7]

In 1990 Congress replaced ELIHPA with the Low Income Housing Preservation and Residential Homeownership Act of 1990 ("LIHPRHA" or "Title VI"). In addition to making permanent the moratorium on prepayment, LIHPRHA authorized HUD to provide incentives to owners to maintain the affordability restrictions on their properties.[8] Pub.L. 101–625, 104 Stat. 4249, *codified at* 12 U.S.C.A. § 4101 *et seq.* (West 1993).[9]

---

7. The text of § 225(a), which is specifically applicable to prepayment, reads in pertinent part:
 The Secretary may approve a plan of action that involves termination of the low income affordability restrictions only upon a written finding that—
 (1) implementation of the plan of action will not materially increase economic hardship for current tenants... or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available, determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and
 (2)(A) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect—
 (i) the availability of decent, safe and sanitary housing affordable to lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve;
 (ii) the ability of lower income and very low-income families or persons to find afforda-

ble, decent, safe, and sanitary housing near employment opportunities; or
 (iii) the housing opportunities of minorities in the community within which the housing is located....
 These limitations on HUD's discretion to approve prepayments have essentially been preserved at 12 U.S.C. § 4108.

8. The incentives authorized by LIHPRHA include authorization to increase ceilings on rents, an increase in the authorized annual rate of return from participating properties, financing of capital improvements, and equity loans, among other things. 12 U.S.C. § 4109.

9. LIHPRHA was passed upon the expiration of ELIHPA. Under § 203(a) of ELIHPA, the prepayment restrictions were to expire two years after its enactment, or February 5, 1990. 12 U.S.C. § 1715*l* (note, § 203(a)). ELIHPA's expiration date was extended three times, the last time until November 30, 1990, or the date of the enactment of LIHPRHA, whichever was earlier. Pub.L. No. 101–494 at 2. Congress eventually passed LIPRHA on November 28, 1990.

Under LIHPRHA, whether a developer wishes to prepay the mortgage or to apply for incentives, the same procedures apply. The process is begun when a property owner files a Notice of Intent ("NOI") with HUD, "in the form and manner" prescribed by the agency, with copies to be sent to state and local housing authorities, mortgagees, and tenants. 12 U.S.C. § 4102. The property must then be appraised by two independent appraisers to determine its "preservation value," which in turn becomes a basis for any incentives which are ultimately offered to the owners. 12 U.S.C. § 4103; see also id. §§ 4104(a), 4110(d). Within nine months after receiving an NOI, or six months if the NOI proposes to terminate affordability restrictions, HUD must send the owner a report containing the results of the appraisals and other information necessary for the owner to proceed. 12 U.S.C. § 4106. The owner must then, within six months, file a Plan of Action ("POA") with HUD, indicating whether the owner wishes to prepay the mortgage (terminating the affordability restrictions), extend the affordability restrictions by requesting incentives, or sell the property to a buyer who will agree to maintain the affordability restrictions. 12 U.S.C. § 4107. When passing upon prepayment requests, HUD applies a test that granted such requests as long as prepayment would not materially increase economic hardships on existing tenants, involuntarily displace such tenants, or decrease the availability of decent, safe, sanitary low-income housing. 12 U.S.C. § 4108.

HUD must approve or disapprove a POA within 180 days of filing, provided the POA is not deficient. 12 U.S.C. § 4115(b). If a POA requesting incentives is approved after the 180 days have passed, LIHPRHA requires that the incentives be retroactive to 180 days after the filing of the POA. 12 U.S.C. § 4115(c). To ensure the timeliness of HUD's POA approval process, LIHPRHA allows an owner to seek relief in federal district court if HUD does not approve the POA within the statutory time limit. Id.

Finally, on March 28, 1996, Congress passed the Housing Opportunity Extension Act of 1996 ("HOPE" or "the 1996 Act"), Pub.L. No. 104–120, which directed the Secretary of HUD to use appropriated HUD-insured housing program funds to permit program participants to prepay their existing mortgage balances. Such prepayment was conditioned on an agreement by the owners not to raise rents for 60 days. "The legislation also provides owners the opportunity to prepay their mortgages or request voluntary termination of a mortgage insurance contract, as long as the owner agrees not to increase rents for 60 days after such prepayment." H.R.REP. No. 104–384, at 47 (1995) (effecting H.R.2099, 104th CONG. (1995)).

Throughout the early 1980s, the owners of three of the four model properties (Sherman, Independence, and St. Andrews) at issue entered into Section 8 Housing Assistance Payment ("HAP") contracts pursuant to 24 C.F.R. § 886, Subpart A; the United States Housing Act of 1937, 42 U.S.C. § 1437, et seq.; and the HUD Development Act, 42 U.S.C. § 3531, et seq. Among other things, these contracts restricted the use of low income rental units and the rents chargeable thereon. Section 27(c) of these contracts also provided that any prepayment of plaintiffs' existing mortgage balances would not, in and of itself, affect any of the property owners' or HUD's rights under the HAP contracts. Throughout the 1980s and the early 1990s, the owners of these three model properties renewed the effective terms of these HAP contracts for five-year periods. In 1994 and 1995, the government also provided emergency assistance loans to the Title VI plaintiffs following the Southern California earthquake of January 17, 1994. This assistance was received pursuant to the HUD Earthquake Loan Program ("HELP"), which provided funds for the costs of limited and major repairs, relocation, demolition, retrofitting, etc. in exchange for the property owners' agreement to provide affordable, use restricted dwelling units for a period of 10–15 years or until the HELP loan was repaid.

In Cienega I, this court found that, by signing the regulatory agreement and the deed of trust note to which the regulatory agreement referred, plaintiffs promised to construct and maintain housing in accordance with HUD's specifications, to accept only low- or moderate-income persons as tenants,

to charge no higher rents than those permitted by HUD, to distribute profits to shareholders in accordance with specified limitations, to make timely payments on their mortgages and to maintain cash reserves to self-insure against mortgage default. These promises were made expressly to and for the benefit of the government, not third parties. In exchange, the government agreed to endorse and insure the mortgages, allowing plaintiffs to obtain either subsidized commercial loans or loans at favorable interest rates, and to allow plaintiffs to free themselves of HUD's regulatory strictures after the first 20 years. Accordingly, the court found that Congress, by enacting Titles II and VI, breached the government's contracts with plaintiffs, because ELIHPA and LIHPRHA placed restrictions on the right to prepay existing mortgage balances, which would otherwise have been unrestricted after 20 years. Further, this court determined that neither the sovereign acts doctrine nor the unmistakability doctrine was availing to the government to escape liability for breach of contract.

### *Contentions of the Parties*

As a result of the government's breach of contract, plaintiffs contend that they are entitled to $3,420,864 in damages for the four model properties at issue, St. Andrews Gardens and Sherman Park under Title II and Independence Park and Pico Plaza under Title VI. Plaintiffs contend that defendant must pay damages to plaintiffs for the loss of market rents caused by the government's breach. Damages in the form of market rents, argue plaintiffs, were reasonable, foreseeable, directly caused by the' breach, and appropriate regardless of whether plaintiffs were new businesses.

Plaintiffs also argue that the Los Angeles Rent Stabilization Ordinance ("LARSO") does not in any way reduce the measure of damages to which plaintiffs are entitled. The subject properties were specifically exempted from LARSO and, upon prepayment, would not have been subject to this ordinance. In the alternative, plaintiffs contend that LARSO is preempted by federal law, specifically the preemption provision found in LIHPRHA.

Plaintiffs contend that there is overwhelming evidence showing that they would have prepaid their mortgages and terminated their participation in the HUD programs but for the enactment of ELIHPA and LIHPRHA. Plaintiffs further argue that their damages award should be neither barred nor reduced as a result of HUD's forced extensions of their Section 8 Rent Subsidization contracts. According to plaintiffs, they were compelled under economic duress to renew these contracts in order to meet their long term mortgage payment obligations. Therefore, these contracts, argue plaintiffs, are unenforceable and, if nothing else, constitute an attempt by plaintiffs to mitigate the damages flowing from the government's breach. Similarly, plaintiffs argue that their damages award should not be offset by their acceptance of post-POA relief pursuant to the HUD Earthquake Loan Program.

Finally, plaintiffs maintain that the court should adopt the damages model of plaintiffs' expert witness. Plaintiffs contend that this economic model is comprehensive and based on objective, verifiable data pertaining to rents, vacancy rates, and operating expenses. In contrast, defendant's economic model, argue plaintiffs, is subjective and plagued by glaring errors, material omissions, and incorrect assumptions. Plaintiffs argue that defendant's economic experts failed to correctly consider the effect of debt service calculations, HUD interest rate subsidies, management fees, post-prepayment restrictions, consideration of HELP loans, conversion costs, and the costs of processing.POAs. Moreover, plaintiffs believe that once these shortcomings are rectified, defendant's damages model varies from plaintiffs' by only a narrow margin of error. For these reasons, plaintiffs insist that their economic model should be adopted by the court since it may be easily applied to the remaining litigation without requiring individualized judgment calls and miring the court in costly, additional evidentiary and valuation hearings.

Defendant argues that plaintiffs are entitled to no damages for the government's breach of contract. In fact, defendant con-

tends that plaintiffs actually benefited from their participation in the HUD programs and accuses plaintiffs of trying to recover lost rental profits to which they are not entitled. Such damages for lost profits, argues defendant, are too remote, contingent and speculative to be properly recovered. Defendant also challenges plaintiffs' damages theory as being flawed in that it understates the size of the conventional loans that plaintiffs would have obtained had they prepaid their HUD-insured mortgages. That is, it incorrectly assumes that if plaintiffs had been allowed to prepay, they would have obtained conventional loans in substantially smaller amounts than they could have obtained using the subject properties as security. Thus, defendant argues that under market conditions plaintiffs' estimated operating cash flow is greatly exaggerated while their debt service is unrealistically understated.

The government asserts that the Section 8 HAP contracts by three of the four model properties restricted the use of low income rental units and the rents chargeable thereon. Plaintiffs, therefore, were precluded from converting the dwelling units covered by the Section 8 contracts to conventional rental units on the 20 year prepayment date or during any time period for which damages are sought. Defendant argues that plaintiffs' position that they had no realistic option other than to renew the HAP contracts is without merit. Defendant claims that plaintiffs could have chosen to exit the program rather than renewing, thereby charging those fair market rental rates permitted by the regulatory agreements. Thus, defendant contends that those plaintiffs who entered into Section 8 HAP contracts, or at least renewed them following enactment of ELIHPA and LIHPRHA, have suffered no damages.

Even if plaintiffs could have prepaid their HUD-insured mortgages and converted the subject properties to conventional rental income properties, defendant maintains that LARSO would have applied and limited the rents plaintiffs could have charged. To properly evaluate plaintiffs' argument that but for the enactment of ELIHPA and LIHPRHA prepayment and conversion to conventional were certain, defendant contends that the court must eliminate consideration of these two acts, including LIHPRHA's preemption provision, when examining plaintiffs' damages claims. Thus, defendant asserts that LIHPRHA's preemption provisions are no shield to LARSO's indirect prohibition of prepayment and conversion.

Defendant also disputes plaintiffs' calculations. Defendant argues: (1) even if plaintiffs were able to prepay, convert to conventional and charge market rents, the claimed market rents are too high; (2) the claimed costs of plaintiffs' identity-of-interest property management firm, G & K Management Co., Inc., of processing POA's are too high and unsubstantiated; and (3) plaintiffs claimed legal expenses associated with the preparation and processing of POA's are inappropriate, non-recoverable consequential damages for which there is no mandating statute.

### Discussion

The purpose of an award of damages is to "place the non-breaching party in as good a position as it would have been if the contract had been completely performed and without charging the breaching party with harms that he had no sufficient reason to foresee when the contract was made." *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 875–76, 524 F.2d 707, 713, n. 13 (1975) (declining to award damages that were too uncertain and remote), cert. denied, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976); *see also* RESTATEMENT (SECOND) OF CONTRACTS §§ 329 cmt. a, 335 (1981). In order to recover damages, plaintiffs bear the burden of proving that they have satisfied all the elements of a four-pronged test: (1) the existence of a valid contract between themselves and the United States [10]; (2) an obligation or

10. In passing, the court notes a recent decision that considered the issue of privity in the HUD context. In *Lurline Gardens Ltd. Hous. Partnership v. United States,* 37 Fed.Cl. 415 (1997), property developers entered into regulatory agreements with HUD and into mortgage agreements with private lending institutions, which were endorsed by HUD. In *Lurline,* the court summarily rejected the plaintiffs' privity arguments. This court respectfully disagrees with Lurline. The

duty flowing from said contract; (3) a breach of that obligation or duty; and (4) the amount of damages caused by the breach. *San Carlos Irrigation & Drainage District v. United States*, 877 F.2d 957, 959 (Fed.Cir. 1989); *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965). The first three of these requirements was proved by plaintiffs as indicated in *Cienega I*. In the present case, the benefit necessary to put plaintiffs in as good a position as they would have been but for the breach was precisely their main motivation for entering the HUD program in the first place. While "not every injury resulting from a breach of contract is remedial in damages," *Wells Fargo Bank N.A. v. United States*, 88 F.3d 1012, 1022 (Fed.Cir.1996) (forbidding lost profit damages for transactions clearly unrelated to the breached contract), recovery of lost profits is proper when the plaintiffs prove the elements of a further test with sufficient evidence. *Boyajian v. United States*, 191 Ct.Cl. 233, 423 F.2d 1231, 1235 (1970). To the extent that plaintiffs' damages were foreseeable at the time of contract formation, not at the time of the breach, they are recoverable. *Lucas v. United States*, 25 Cl.Ct. 298, 310 (1992) (citing *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 545–47, 23 S.Ct. 754, 756–57, 47 L.Ed. 1171 (1903)).

▮▮▮▮ The three-pronged test for the award of lost profit damages requires that plaintiffs prove: (A) causation; (B) contemplation; and (C) certainty. *See Chain Belt Co. v. United States*, 127 Ct.Cl. 38, 115 F.Supp. 701, 714–19 (1953), *cited as positive authority by, H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1576 (Fed.Cir.1984).

In order to recover lost profits as damages for breach of contract, [A] it must first appear that such loss is the *immediate and proximate result* of the breach. [B] It must also be established that loss of profits in the event of breach was *within the contemplation* of the contracting parties either (1) because the loss was natural and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have foreseen it; or (2) if the breach resulted in lost profits because of some special circumstances, those circumstances must have been known to the defaulting party at the time the contract was entered into to. [C] Finally, there must be established a *sufficient basis for estimating* the amount of profits with reasonable certainty.

*Id.* (emphasis added); *see also Wm. T. Thompson Co. v. United States*, 26 Cl.Ct. 17 (1992), *aff'd sub nom.*, 24 F.3d 188 (Fed.Cir. 1994), *aff'd,* —— U.S. ——, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (holding that elements of this tripartite test were not proven by a plaintiff who incurred speculative damages while defending and settling an earlier, unrelated lawsuit wherein the original claimants were unable to establish injury). Courts have awarded and measured damages in terms of lost profits, however, even in the case of new businesses as long as the measure of lost profits is foreseeable and reasonably reliable, rather than speculatively uncertain. *See Neely v. United States*, 152 Ct.Cl. 137, 146–47, 285 F.2d 438 (1961) (awarding lost profits for government's prohibition on strip mining); *Passaic Distrib., Inc. v. Sherman Co.*, 386 F.Supp. 647, 651–52 (S.D.N.Y. 1974) (awarding lost rental profits when land-

fact that a deed of trust note names only the lender and the borrower as parties does not fully resolve the question of whether there is privity of contract between the government and plaintiffs *vis a vis* plaintiffs' prepayment rights. In this court's view, the names of the parties on one of the written agreements is not necessarily dispositive, particularly when the language of the prepayment terms themselves assigns to HUD certain critical rights and obligations in addition to and intertwined with those allocated between the parties to the note. As the Rider agreement made clear, whether a borrower could prepay within the first 20 years was solely within the discretion of HUD, not the lending institution.

In other words, a lender's inability to accept prepayment within the first 20 years absent HUD approval does not amount to a lender's right to reject. As evidenced by a sample deed of trust note provided to the court by the parties, the prepayment terms were contained in the Rider agreement, not in the preprinted, HUD-approved deed of trust note forms. In fact, in the sample form, the original prepayment provisions were struck out and a cross-reference was made to the Rider agreement. Regardless, this court found privity of contract by examining all of the documents involved in the transaction and focusing on the substance of the prepayment terms rather than only their location.

lord unreasonably forbade subletting). Whether a business is new or well-established is not necessarily relevant to an award of lost profit damages so long as a plaintiff can prove the elements of the relevant three-pronged test. *Chain Belt*, 127 Ct.Cl. at 61–64, 115 F.Supp. 701 (holding that increased scale and size or location of business did not necessarily render a business venture new). When showing the measure of damages in terms of lost profits, plaintiffs must prove at least a loss of value to their interest in property, but they need not demonstrate the actual ability to sell at market rates or otherwise. *Hetzel v. Baltimore & O.R. Co.*, 169 U.S. 26, 36–37, 18 S.Ct. 255, 258–59, 42 L.Ed. 648 (1898); *see also* 11 Williston, TREATISE ON THE LAW OF CONTRACTS § 1338 (3d ed.1968).

## I. *Proof of Lost Market–Level Rent Profits*

### A. Causation

The enactment of ELIHPA and LIHPRHA specifically prevented plaintiffs from exercising the prepayment provisions in their housing agreements. As an inevitable result, they were unable to raise the rents to market levels. Indeed, that was one of the specific purposes of this legislation, *see* 12 U.S.C.A. § 1715*l*(a)(3), Pub.L. 100–242, 101 Stat. 1877, because Congress was concerned that a large number of owners might prepay their existing mortgage balances within a short period of time, reducing drastically the supply of low-income rental housing throughout the country. See S.REP. No. 316, 101st Cong., 2d Sess. 105, reprinted in 1990 U.S.C.C.A.N. 5763, 5867. This objective was cemented in 1990 when Congress replaced ELIHPA with LIHPRHA, one of the purposes of which was to make permanent ELI–IPA's two-year moratorium on prepayment. Pub.L. 101–625, 104 Stat. 4249, *reprinted* at 12 U.S.C.A. § 4101 *et seq.* (West 1993). It was clear at trial that, but for LIHPRHA's prohibition of prepayment, plaintiffs intended to take the necessary steps to prepay their existing mortgage balances and to convert their properties to conventional, unrestricted status. *Transcript of Cienega I Damages Trial Record ("R.")* at 55–57.

▇ Defendant asserts that causation has not been established since, despite the government's breach, plaintiffs would not have been able to prepay the existing balances on their HUD insured mortgages. The award of lost rental profits, therefore, is improper according to defendant's case. In support of this position, defendant presented evidence challenging the debt service analysis of plaintiffs' economic expert, Dr. Richard Peiser. Defendant argued at trial that even without LIHPRHA's prepayment restrictions, plaintiffs would have been unable to prepay their HUD insured mortgages because they would not have obtained conventional loans in smaller amounts than needed to pay the mortgage balances, as claimed by plaintiffs, but would have borrowed greater amounts at greater costs. In other words, defendant claims that because of extra costs, there is alternate causation in plaintiffs' inability to convert to conventional properties. Defendant claims that Dr. Peiser admitted that the debt service on a larger 75% loan-to-value leveraging would be substantially higher than the debt service for the smaller loan amounts used in Dr. Peiser's analysis. This would result in a much lower projected cash flow for each housing project. (*R.* at 397–408.) This position, however, accounts for only half of the cash flow. To properly evaluate Dr. Peiser's economic model, one must evaluate all the pros and cons of using different sized loans, including greater amortization, the owners' build-up of equity and the money earned through interest or reinvestment. One cannot simply input a higher conventional loan amount, subtract the correspondingly higher debt service from the projected income, and then argue that the lower operating cash flow—and, therefore, damages—indicates that plaintiffs would not have been able to prepay their loans. Dr. Peiser properly made the conservative assumption that plaintiffs would refinance only up to the amount needed to pay off the outstanding HUD mortgages plus points on the new mortgages.

Even if it were more likely than not that plaintiffs would indeed have borrowed more money at conventional market rates, the economic impact of the additional proceeds from such loans must be taken into account. (*R.* at 405–08.) This impact would be to offset

the reduction in operating cash flow and could actually yield higher damages. In fact, plaintiffs' expert testified that his model is actually *more* conservative in quantifying damages than is defendant's reinterpretation thereof. (R. at 407.) Defendant's expert, Mr. Alan Nevin, would have the court treat the larger, proposed refinancing strictly as a cost without considering the commensurate benefit reasonably derived from the additional borrowed funds. (R. at 701–02.) Nor did he at least include the potential benefit as opportunity costs, which as interest, are not recoverable against the government. (R. at 696.) This analytical error was admitted by defendant's expert on cross-examination. (R. at 694–96, 699.)

The court finds plaintiffs' expert's use of smaller loan amounts with resultant lower debt service and higher projected operating cash flow not only reasonable but preferable to defendant's proposed alternative. In essence, defendant's alternative would inflate the size of plaintiffs' conventional loans without properly offsetting the potential profits from the management and reinvestment of the proceeds realized from the amount included in larger conventional loans not needed to repay the HUD-insured mortgages and financing costs of the conventional loans. If anything, the alternative analysis suggested by defendant, when all factors are taken into account, results in a more remote, contingent, and speculative economic conclusion. Defendant characterizes application of plaintiffs' expert's economic model to this case as "attempting to squeeze a lost rental profits theory of recovery into a shoe that does not fit," *Def.'s Post–Trial Brief* at 31 n. 12, yet Dr. Peiser's assumptions were actually conservative. The court finds Dr. Peiser's economic model more comprehensive and economically rational than that of either of defendant's experts, Messrs. Cunningham and Nevin. Had plaintiffs refinanced more than was needed to pay off the existing loans, they would almost certainly have sought to reinvest the excess principal to produce a greater rate of return than the return produced by the interest rate they would have had to pay for borrowing additional money.

## B. Contemplation

The evidence presented during trial strongly indicates that plaintiffs intended from the beginning to prepay their existing mortgage balances on the original prepayment date and to convert their subsidized properties to conventional ones. (R. at 55–57, 114–15.) One of the primary incentives offered by HUD to the property owners to encourage the construction and development of low-income housing, an essential aspect of Sections 221(d)(3) and 236, was the ability of the owners to prepay their existing mortgage balances and terminate HUD restrictions without HUD approval after 20 years. *Cienega I*, 33 Fed.Cl. at 210. This enticement and the corresponding ability to convert to conventional became a material term of the contract. (R. at 37–38, 55.) It is clear that without the ability to charge market level rents upon prepayment and conversion to conventional, plaintiffs' anticipated prepayment rights would have been meaningless and purposeless. The contemplated ability to prepay and exit the HUD program upon the 20 year prepayment date is reflected in the precise locations chosen for the properties at issue. After careful study, the court observed that the four representative model properties are all located in middle class neighborhoods and, in general, are equal to or surpass the quality of the neighboring properties in each area. Jona Goldrich of G & K testified that the locations of these properties were specifically chosen, i.e., built or acquired, based on superior location and other attributes to maximize appreciation upon prepayment and conversion to conventional market properties. (R. at 37–38.) The evidence indicates that plaintiffs would not have entered into the agreements with HUD but for this long term benefit, which was described as follows:

> It means that the rents will be very high and the market value of the project will be very high, because the limited dividend of the 20 years really didn't justify the effort of dealing with HUD and—the downside risk was small, but the work was very hard. . . . The quality also I was looking for the long run. Make sure that those are low maintenance buildings. That they

will be up to date 20 years down the line and be at least as good a quality as the conventional buildings ... being able to add, for example, when there are no more HUD [restrictions,] swimming pools, gyms, spas and things like that to make them competitive with the conventional market. (*R.* at 38–39 (Goldrich).) While not all of the properties' neighborhoods improved consistently over the 20 year period as originally projected, e.g., Pico Plaza, this was attributable to unforeseen, external factors such as recent gang activity rather than the maintenance and quality of the property itself (*R.* at 62.) Nonetheless, the court observed during its February 7, 1997 site visit that some of the model properties were in many respects in better condition than neighboring, unsubsidized, conventional properties. Further, the long term benefit of these properties was not limited to converting them to conventional and then raising the rents to market levels. Each of these properties had great potential for refinancing well above the amount owed and reinvesting the proceeds in other investment opportunities or for conversion and resale as condominium complexes. (*R.* at 64–66.) Plaintiffs' injury was contemplated by the parties in that it was the natural and inevitable result of defendant's breach, and the court simply does not believe that plaintiffs entered into the HUD program without intending to reap a commensurate economic advantage as of the 20 year prepayment date. *See Chain Belt Co. v. United States,* 127 Ct.Cl. 38, 115 F.Supp. 701, 714–19 (1953). Defendant's contention to the contrary rings hollow. Plaintiffs' damages, therefore, were not only the natural and probable, but also the reasonably foreseeable and anticipated consequence of defendant's breach.

## C. Certainty

■ Absolute certainty in quantifying loss of profits is not required. A reasonably certain estimation of the measure of lost profits will suffice to calculate damages, *Chain Belt,* 127 Ct.Cl. at 58–61, 115 F.Supp. 701, as long as that estimation does not claim costs that are "too remote, speculative, and consequential to be compensable as damages." *Northern Helex,* 207 Ct.Cl. at 888, 524 F.2d at 721.

Two basic economic approaches were used to quantify damages in this case. The government performed a valuation analysis of the four model properties with HUD restrictions and without as of the prepayment date. This analysis, however, actually supported plaintiffs' position that damages were in excess of $5.141 million if plaintiffs had been allowed to convert and sell the four model properties on the original prepayment date as opposed to selling them as-is or as restricted housing. This was admitted by defendant's real estate economist, Mr. Nevin, at trial. (*R.* at 650–51.) The parties on both sides of this case used the income differential approach, i.e., calculating the difference between the sum of the rental income and benefits plaintiffs actually received during the relevant time frame and the total projected operating cash flow under market conditions (the amount they would have received had they been allowed to prepay, convert to conventional, and charge market rents), to arrive at a damages figure. The *projected* operating cash flow under market conditions is computed by subtracting the sum of *projected* debt service, management expenses, and operating expenses *from* the *projected* rental income. Each of these figures requires accurate data to provide a reliable damages model. While the parties' share the rationale underlying this basic approach, the data used to forecast their respective damages figures was strikingly different. Not surprisingly, the parties' variant data with respect to three key assumptions produced a substantial discrepancy in the parties' computation of plaintiffs' damages.

### 1. Rent Levels

■ In order to arrive at a reliable figure for damages from an income analysis, one must examine market rent figures, which directly affect gross income. Plaintiffs' basis for calculating lost rental income includes the market rent data for the units in their developments. As part of the Title II and Title VI programs, HUD commissioned market appraisals of the properties, which resulted in market rent level guidelines adopted by Congress. Based upon these appraisals, the rent levels were negotiated at arms length

and agreed to by HUD as part of plaintiffs' POAs. *See* 12 U.S.C. § 4107; HUD Form 9607; (*R.* at 293–96). These projected rent levels were in turn relied upon by plaintiffs as the most conservative and reliable indicators of market rents when considering their rates of return as of the prepayment date. Thus, plaintiffs claim as lost rental income only the difference between these projected market rent levels and the below-market rents levels plaintiffs were compelled to accept due to defendant's breach of the section 221(d)(3) and 236 contracts. In contrast, defendant has chosen to disregard the HUD agreed-upon rent level projections and, instead, commissioned its own appraisals after the fact.

The court noted at trial that these appraisals performed by defendant's expert, Mr. Cunningham, inevitably and admittedly incorporate his own experience, subjective judgments, and speculative assumptions. (*R.* at 466, 541, 556.) In turn, defendant's other expert, Mr. Nevin, relied on these numbers for his analysis. (*R.* at 656.) Further, Mr. Cunningham admitted that at least some of the HUD-commissioned, government approved guidelines and appraisals may reflect market rent levels as of the original prepayment dates, though he chose to disregard them in his own analyses. (*R.* at 545.) Defendant also points out that plaintiffs have averaged the market rent levels in the input of their damages model. The court finds that this is not improper, since it will correct for any standard deviation in the agreed-upon rent levels, which again may already conservatively understate the actual rent levels. Contrary to defendant's suggestion, the court cannot countenance adopting admittedly subjective, retrospective appraisals of projected market rent levels when there is a more reliable, verifiable industry data source that was promulgated by the government itself Accordingly, the court finds that the market rent levels used in plaintiffs' economic model are reasonable.

## 2. Vacancy Rates

Vacancy rates are another key factor in any rental income analysis that directly impacts gross income and, therefore, the damages calculation. Again, plaintiffs' expert utilized verifiable industry data based on surveys of operating properties. When such figures were unavailable, Dr. Peiser used actual G & K experience with similar properties without any manipulation or injection of assumptions. (*R.* at 323–26.) In contrast, defendant's expert, Dr. Nevin, testified that he adjusted the industry data sources upon which he relied to arrive at the relevant vacancy rates. In part, at least, Mr. Nevin's opinion relied on Mr. Cunningham's judgments, which the court has already found to be needlessly subjective. (*R.* at 656–57.) Defendant's expert conceded that it would be reasonable to disagree with the reliability of defendant's reconstructed data. (*R.* at 658.) Given the ready availability of verifiable industry data, the court so disagrees. Accordingly, the court finds plaintiffs' data to be of greater probative value.

## 3. Operating Expenses

It is critical under the market scenario to consider the amount of operating expenses plaintiffs would have incurred had they been allowed to prepay their existing mortgage balances. Plaintiffs again chose to rely on verifiable data, i.e., the actual operating expenses under HUD restrictions for those items likely to remain constant under either HUD or market conditions, including taxes, insurance, and utilities. At trial, however, it became clear that certain operating expenses, such as administrative and maintenance expenses, are understandably higher under HUD conditions. The reasons for this include increased wear-and-tear, repairs, and auditing costs. (*R.* at 40–41, 88, 98, 102, 296–97.) This fact is confirmed by defendant's own expert report. *Def.'s Trial Exhibit ("DX")* 301 at 74. The recognized industry data source, the Institute of Real Estate Management ("IREM"), also confirms this regarding conventional operating expense data from properties comparable to those at issue. (*R.* at 336–37.) In contrast, defendant again relied on the speculation of its expert witness, Mr. Nevin, who adjusted *conventional* property operating expense data upward according to his judgment and experience even though he actually had little experience with HUD-restricted properties upon which to base a comparison. (*R.* at 657,

671, 674–77.) The project data upon which Mr. Nevin relied were never submitted to the court. Yet defendant's expert admitted that the industry data, the IREM data, are perfectly valid and that his one criticism that IREM data were not age-specific to certain properties would have been negated had he been aware that the average age of the properties considered by plaintiffs' expert was proper. (*R.* at 673–74.)

The court notes that Mr. Nevin consistently adjusted conventional property operating expenses upward despite the fact that IREM data show such expenses to be lower. Mr. Nevin attributed this simply to an arbitrary choice to round up various figures for reasons he could not satisfactorily explain.

Q: Where does that [on-site management expense] number come from? ...

A: Excuse me. Excuse me. Sorry. In that case I just rolled up $25,130 to $26,000....

Q: You *rounded* it up? ... Any reason you couldn't have just used $25,130? ...

A: *No reason at all.*

Q: ... I think you told us in your deposition that the reason you [increased water and sewer expenses by 30%] was you *just had a feeling* that that was the right number, is that correct?

A: Yes, and I am embarrassed to tell you I don't remember the rationale behind it.

(*R.* at 675–76 (emphasis added).) He does not remember the rationale behind it? Arbitrary, subjective upward adjustments such as this to operating expenses render defendant's data questionable. Accordingly, the court again declines to adopt such subjective

estimations over reliable, verifiable industry data.

## II. *The Section 8 HAP Contracts*

The government provided Section 8 assistance in the form of HAP contracts, which subsidized the rent balance that was not paid by very low-income tenants. These HAP contracts, which were directly entered into and renewed by the government and three of the four model properties (Sherman, Independence, and St. Andrews), imposed limitations upon the uses to which the dwelling units could be put.[11] That is, the HAP contracts forbade conversion of the affected dwelling units to conventional. These limitations were independent of the affordability restrictions imposed by the Regulatory Agreements. *Joint Trial Exhibits ("JX")* 8–10, 37–39, 61–63. The HAP contracts also provided that "[p]repayment of the mortgage shall not, by itself, affect any rights of the Owner or HUD under this Contract." *Id.* § 27(c). Further, § 28 of these HAP contracts provided:

> To the extent that this Contract conflicts with any agreement(s) between the Owner and HUD, the provisions of this Contract shall be controlling. The provision(s) of the other agreement(s) shall be considered to be amended by the terms of this Contract. Such amendments shall be valid as if such amendment had been made directly to such agreement(s). These amendments shall be effective only during the term of this Contract.

Defendant relies on these provisions in arguing that the three affected model properties were contractually precluded from converting any dwelling units to conventional on the 20

---

11. The court distinguishes the instant case from *National Leased Housing Ass'n v. United States,* 105 F.3d 1423 (Fed.Cir.1997), in which a portion of the plaintiff-property owners entered into Section 8 HAP contracts directly with local housing agencies rather than with HUD, unlike in the case at bar. Those plaintiffs invoked the three-pronged contractor-agency test of *United States v. Johnson Controls Inc.,* 713 F.2d 1541 (Fed.Cir. 1983) to argue that as agents of the government, they could sue the government. The Federal Circuit held: (1) HUD did not breach the Section 8 HAP contracts by using comparability studies to bring Section 8 HAP contract rents back into line with comparable, unassisted rents levels; (2) there existed no third-party beneficiary status for property owners who contracted directly with local housing agencies rather than with HUM; (3) there was no privity of contract between the government and those plaintiffs, who contracted directly with local housing agencies rather than with HUD, when the Section 8 contracts do not state that the government will be directly liable for the purchase price; and (4) that HUD's decision to assume the local housing agencies' rights and obligations was discretionary. None of the issues addressed in *National* is on point.

year prepayment date or during any time period for which plaintiffs seek damages.

 Certainly, plaintiffs did not foresee the enactment of ELIHPA and LIHPRHA and, therefore, originally chose to enter into the HAP contracts willingly. While plaintiffs argue that HAP contract renewal was compelled by *economic duress* created by defendant's breach, this does not automatically render all such contracts unenforceable, contrary to plaintiffs' contentions.[12] The doctrine of contractual economic duress requires the claimant to prove that: (1) it involuntarily accepted the offer to contract; (2) there was no reasonable alternative lest the claimant face economic ruin—not merely hardship; and (3) the circumstances necessitating acceptance were the result of the opposing parties' coercion or wrongful conduct. *United Internat'l Investig. Svcs. v. United States,* 33 Fed.Cl. 363, 367 (1995); *Sneeden v. United States,* 33 Fed.Cl. 303 (1995). If such economic duress can be established, "a contract entered into under duress is generally considered not void, but merely voidable, and one who would repudiate a contract procured by duress must act promptly or will be deemed to have elected to affirm it." *Scientific Holding Co., Ltd. v. Plessey Inc.,* 510 F.2d 15, 23 (2d Cir.1974), *cited by, Fayard v. Henry Holt & Co.,* 726 F.Supp. 438, 447 (S.D.N.Y.1989). Plaintiffs have not substantiated their claims of economic duress. While they have proven that they almost certainly would have faced great financial hardship, there is insufficient evidence to establish that they would have suffered financial ruin if they did not renew the Section 8 HAP contracts. The court concludes, therefore, that there was no economic duress and that the HAP contracts are indeed enforceable.

Under the terms of the HAP contracts, "[p]repayment of the mortgage shall not, by itself, affect any rights of the Owner or HUD under this Contract." *JX* 8, 37, 61 § 27(c). Even if plaintiffs enjoyed the unfettered fight to prepay their existing mortgage balances

and convert their properties to conventional, they still would have had to comply with the terms of the HAP contracts. In response, plaintiffs claim that HAP contract renewal under protest and reservation of right was a good faith attempt to mitigate their damages. Quite apart from the issue of breach, it is well-recognized that the non-breaching party bears the duty to mitigate damages. *See Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174, 186–87 (1997); *Thomas Creek Lumber & Log Co. v. United States,* 36 Fed.Cl. 220, 248 (1996). Whether or not an attempt to mitigate damages is successful, the non-breaching party may recover for injury incurred during such mitigation as long as the attempt was reasonable. *International Fidelity Ins. Co. v. United States,* 25 Cl.Ct. 469, 479 (1992).

> Inasmuch as the law denies recovery for losses that can be avoided by reasonable effort and expense, justice so requires that the risks incident to such effort should be carried by the party whose wrongful conduct makes them necessary. Therefore, special losses that a party incurs in a reasonable effort to avoid losses resulting from a breach are recoverable as damages.

5 Corbin, CONTRACTS § 1053 (1964); *see also* 11 Williston, TREATISE ON THE LAW OF CONTRACTS §§ 1353–55 (3d ed.1968). The court, however, is not convinced that plaintiffs' renewal of the Section 8 HAP contracts was motivated more by the desire to mitigate damages than merely to stay afloat economically, for which a benefit was contractually conferred by the government. While HAP contract renewal may have helped plaintiffs avoid great financial hardship, if not ruin, precipitated by the -government's breach, plaintiffs did receive consideration in the form of rent subsidization for renewing the HAP contracts.

The dispositive issue then with respect to Section 8 housing assistance is whether plaintiffs would indeed have renewed the HAP contracts, assuming there had been no

---

**12.** The two cases cited by plaintiffs in support of their economic duress theory, *McLain Plumbing v. United States,* 30 Fed. Cl. 70, 73 (1993) and *Shelton v. United States,* 215 Ct.Cl. 908, 911, 1977 WL 9598 (1977), consider only whether

economic duress may render unenforceable agreements for accord and satisfaction, which differ materially from a contractual, bargained-for exchange.

breach by the government, once their unfettered prepayment rights would have been restored. Defendant argues that plaintiffs could have chosen not to renew the HAP contracts without necessarily facing unreasonable economic duress. According to this view, following the vacancy of low-income tenants, plaintiffs could have rented the units to new tenants who could have afforded the basic, fair market rental rates permitted by the Regulatory Agreements and remained economically viable. This view, mentioned for the first time in footnote 13 of *Defendant's Post–Trial Brief*, is not sufficiently supported by the evidence introduced at trial. In contrast, Carole Glodney, the president of G & K, testified that but for the enactment of ELIHPA and LIHPRHA plaintiffs would never have renewed their HAP contracts beyond their original 20 year prepayment dates.

Q: I would like to assume for a moment that Title II and Title VI had never been enacted.

A: Okay.

Q: Would the owners have renewed this Section 8 contract for a term extending beyond the term of Exhibit 9?

A: No.

Q: Why not?

A: Because they would have prepaid within a few days of the expiration of this contract and they would not have wanted to renew the contract.

Q: Why wouldn't they have wanted to renew it?

A: It would have limited the rents.

Q: As it turned out though, Title II and Title VI had passed by the time this Section 8 contract came up for renewal. So what decision did the owners make as far as renewing this contract?

A: They decided to go ahead and renew it, because what we are processing under at that time basically was tied into Section 8 contract[s]. So it was needed to renew it.

(*R.* at 138 (capitalization corrected).) Defendant failed to dispute this testimony on cross-examination or elsewhere in the record. Thus, it remains pure speculation whether this course of action was actually economically feasible, as defendant suggests. More importantly, even if it were economically feasible, the need to take such action was occasioned by the government's breach in the first place, since plaintiffs could not prepay as planned. The evidence shows that by renewing the HAP contracts after the government's breach, i.e., after enactment of ELIHPA and LIHPRHA, plaintiffs were trying to make the most of an unfavorable, economic situation. While renewal may have been neither plaintiffs' ideal action nor the result of economic duress, the dilemma with which they were presented was, at best, a Hobson's Choice. Once constrained to remain subject to the HUD programs' strictures, HUD drove plaintiffs towards reliance on Section 8 housing assistance.

The court has noted that those plaintiffs who entered into the Section 8 HAP contracts with HUD initially did so prior to the enactment of ELIHPA and LIHPRHA. Upon enactment of ELIHPA and LIHPRHA, however, the government's breach essentially forced plaintiffs into an economic position where they had to extend the terms of the HAP contracts to safeguard their economic viability. If plaintiffs could have prepaid their existing mortgage balances and converted their properties to conventional, there would have been no need to extend the terms of the HAP contracts, since rent subsidization would no longer have been needed or desired. Defendant's breach effectively forced plaintiffs to continue renting their units to low-income tenants for the duration of the HUD mortgages (Title II) or the remaining, useful lives of the properties (Title VI) to meet their mortgage payment obligations. HAP contract renewal was also a prerequisite to continued eligibility for Titles II and VI benefits. Finally, plaintiffs' damages model already accounts for the benefits received pursuant to the HAP contracts for the relevant time periods in the Operating Cash Flow Schedules.[13] *See Pl.s' Ex.s*

---

**13.** Plaintiffs' damages model also accounts for the 1996 HOPE post-prepayment restrictions affecting Pico Plaza as a result of the mandatory 60 day rent freeze provision. (*See* R. at 300–01.)

("PX") 200–204. The court accepts the exhaustive accounting in plaintiffs' damages model and concludes that it is not necessary to count those benefits twice against the damages award. Accordingly, the Section 8 HAP contracts are valid and enforceable, and renewal thereof shall not offset plaintiffs' calculated damages for any of the properties.

### III. The HUD Earthquake Loan Program ("HELP")

On January 17, 1994, Southern California was rocked by a major seismic event, an earthquake measuring 6.6 on the Richter scale, which caused substantial damage to many of plaintiffs' properties. California: State of Shock, TIME, Jan. 31, 1994, at 19. Plaintiffs accepted financial assistance from the federal government for the costs of damage repairs, relocation, demolition, retrofitting, etc. in exchange for the property owners' agreement to provide affordable, use restricted dwelling units for a period of 10–15 years or until the HELP loan was repaid. HUD HELP Notices H94–15 (March 17, 1994), H94–25 (April 15, 1994). Defendant has argued that these agreements are substituted contracts and that these new plaintiffs agreed to bind themselves to defendant's affordability restrictions for the remaining physical life of the property. However, even defendant acknowledged that these new, allegedly substituted contracts did not prohibit prepayment but just required the continued applicability of the affordability restrictions even in the event of prepayment. The court has concluded that as these contracts do not address prepayment, they cannot be superseding contracts on the issue of prepayment. See Cienega Gardens v. United States, 37 Fed.Cl. 79 (1996) ("Cienega II"). The issue of whether the use of HELP funds offsets damages remains.

As an initial matter, the court notes that the acceptance of HELP funds came well after the enactment of LIHPRHA. The Titles II and VI "Terms and Conditions" sections of the HELP Notices state that, if at any time the owners failed to maintain either the requisite low-income proportionality or HUD's Quality Standards ("HQS"), the

HELP loans would immediately become due and payable at an accrued, Small Business Administration ("SBA") interest rate of 4% per annum. Id. This provision clearly indicates that HUD intended the use restrictions to be concurrent with the life of the loan rather than the life of the property. Further, plaintiffs understood that the use restriction obligations under the terms of the HELP loans were also contingent on their receipt of Title VI benefits, which were ultimately not received as a result of Congress' decision not to fund that program. (R. at 190.) Finally and perhaps most importantly, plaintiffs concede that their damages should be offset to the extent they benefitted from the reduced HELP interest rate. Plaintiffs thus accounted for the benefits received via the HELP loans by reducing their damages model's calculation by the interest rate savings for the expected duration of the loans. Plaintiffs' expert economist explained,

it's a small number, but it is a very real benefit to the owners from having stayed under the HUD restrictions. They were eligible for a special earthquake loan called a HELP loan at one percent interest.... So we are simply measuring the interest rate savings of about $2,300 ... in essence, a benefit to the government, and a reduction in the damages we claim.

(R. at 312–13); see also Pls 'Demonstrative Ex. ("PDX") 16. In contrast, defendant neither challenged plaintiffs' accounting nor posited its own treatment with respect to these HELP benefits satisfactorily at trial, in its damages models, in either of its expert reports, or in its post-trial brief The court finds the testimony of plaintiffs' expert probative and very credible. Therefore, the acceptance of HELP assistance shall not further offset plaintiffs' damages any more than already accounted for in Dr. Peiser's damages model.

### IV. The Los Angeles Rent Stabilization Ordinance ("LARSO")

At all times relevant to the case at bar, the City of Los Angeles had a rent stabilization ordinance, codified at Chapter XV, Los Angeles Municipal Code, which makes it

Defendant's model, however, ignored the effect of this provision completely.

"unlawful for any landlord to demand, accept or retain more than the maximum adjusted rent permitted pursuant to [LARSO] or regulations or orders adopted pursuant to [LARSO]." Plaintiffs argue that LARSO does not in any way reduce the measure of damages to which plaintiffs are entitled. The subject properties were specifically exempted from LARSO and, upon prepayment, would not have been subject to this ordinance. In the alternative, plaintiffs contend that LARSO is preempted by federal law, specifically the provision found in LIHPRHA entitled "Preemption of State and local laws." See 12 U.S.C. § 4122(a). Defendant maintains that even if plaintiffs could have prepaid their HUD-insured mortgages and converted the subject properties to conventional, LARSO would have limited the rents plaintiffs could have charged. Defendant further contends that to properly evaluate plaintiffs' argument that but for the enactment of ELIHPA and LIHPRHA prepayment and conversion to conventional were certain, defendant contends that the court must eliminate consideration of these two acts, including LIHPRHA's preemption provision, when examining plaintiffs' damages claims. Thus, defendant asserts that LIHPRHA's preemption provisions are no shield to LARSO's indirect prohibition of prepayment and conversion.

LARSO specifically excepts government operated or exempted dwelling units or those subject to federal subsidization programs. LARSO defines "rental units" as:

> Housing accommodations which a government unit, agency or authority owns, operates, or manages, or which are specifically exempted from municipal rent regulation by state or federal law or administrative regulation, or as to which rent assistance is paid pursuant to 24 C.F.R. [§] 882 ("HUD Section 8 Federal Rent Subsidy Program"). This exception shall not apply once the government ownership, operation,

management regulation or rental assistance is discontinued.

*JX* 94 (LARSO, Sec.151.02, ¶ 18(5)). LARSO, Sec. 151.04 restricts landlords' abilities to raise rents above the maximum, permitted adjusted rent, and LARSO, Sec. 151.06(C) provides for vacancy decontrol whereby the units of below-market rent control tenants, who voluntarily vacated or were evicted for default, breach, or rehabilitation/demolition of the premises, may be raised to market levels. *See also* LARSO, Sec. 151.09(A)(1), (2), (9). In the late 1980s, the Los Angeles City Council became concerned that prepayment of federally subsidized low interest loans under Sections 236 and 221(d)(3) would cause owners to raise rents to market levels, causing a serious impact on the community in the form of excessive rent burdens to tenants and "enormous and unanticipated benefits" to the owners. *Mot. of Councilwoman Ruth Galanter, 6th District* (adopted as amended 23 August 1988). The City Council endeavored to find ways in which to capture the properties at issue within the scope of LARSO. Thus, the 1990 Amendments to LARSO were passed, the express purpose of which was to prevent owners who prepay their existing mortgage balances to HUD from charging market-level rents. Initially, as discussed in Section I.B., *supra*, the City Council's characterization of the benefits to the owners as "unanticipated" is myopic and simply absurd when viewed from the owners' position. The dispositive issue with respect to LARSO is whether the ordinance would have applied to plaintiffs upon prepayment or whether it was preempted by LIHPRHA.[14]

### A. Preemption generally

 The premise behind the doctrine of federal preemption, which finds it constitutional predicate in U.S. Const. art. VI, cl. 2, is that where Congress has constitutionally legislated in a field, any legislation by a state or a political subdivision of a state running counter to the federal action is superseded to the extent it is inconsistent with federal law.

---

14. The court notes plaintiffs' argument that LARSO would not have applied upon prepayment *on its own terms* (narrowly tailored as they were by the Los Angeles City Council around LIHPRHA) or as a result of the operation of "sticky vouchers" (government issued, tenant-based promises to pay market rents) and defendant's response thereto. *See JX* 94 (LARSO, Sec.151.02, ¶ 18(5)); (R. at 184–85, 212–13). The court concludes that these contentions need not be fully addressed, however, in view of the discussion of preemption, which is dispositive of the LARSO issue.

Generally, it is considered permissible for states to supplement the federal legislation or to enact supplemental regulations affecting the same subject matter but only to the extent such regulations do not interfere with the federal plan.

The U.S. Supreme Court has set forth three tests for determining whether the state statute is preempted by the federal law. First, "explicit preemption" is where the language of statute expressly provides, or the federal scheme is so pervasive as to foreclose any inference of room left for state supplementation, the federal act supersedes the state law. *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992); *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 605, 111 S.Ct. 2476, 2481–82, 115 L.Ed.2d 532 (1991); *Cover v. Hydramatic Packing Co.*, 83 F.3d 1390, 1393 (Fed.Cir.1996). Second, "field preemption" is where the federal interest is deemed so dominant as to preclude supplemental state regulation, the federal act will be deemed to preempt the state regulation. *Gade*, 505 U.S. at 98–99, 112 S.Ct. at 2383–84; *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *Cover*, 83 F.3d at 1393. Arguably, neither test is applicable to the case at bar. Neither party has argued that the City of Los Angeles, a political subdivision of the State of California, is without any authority to enact housing regulations and rent control ordinances. Rather, the focus of this argument is the effect of those ordinances upon the intended functioning of the federal program. This moves the discussion to the third test for preemption, "conflict preemption."

 Where state legislation or regulation presents a serious obstacle to the fulfillment of the purposes and objectives of a federal program, the state scheme must fall. *Gade*, 505 U.S. at 98, 112 S.Ct. at 2383 (quoting *Florida Lime & Avocado Growers Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963)); *Cover*, 83 F.3d at 1393; *see also Board of County Supervisors of Prince William County v. United States*, 23 Cl.Ct. 205, 213–14 (1991), *aff'd in part, rev'd in part on other grounds,*

and *remanded,* 48 F.3d 520 (Fed.Cir.1995). As applied to the instant case, there is a strong argument for preemption. A major facet of the federal housing programs was to permit owners to prepay their mortgages after the 20–year anniversary date. As such, the granting of this right to property owners was tied in with the goals of development, management, and eventual, complete privatization of public housing. The expectation as of the enactment of this program and also likely indicated in later Congressional action to foreclose the prepayment option was that owners might exercise this option after 20 years and exit the federal regulatory program. Such action would permit the owners *inter alia* to raise rents to market levels or otherwise reap the benefits from any appreciation in value of the various properties once they were no longer restricted. These significant expectations and inducements are inherent to the federal scheme. Any state or municipal ordinance that materially interferes with the owners' ability to prepay, exit the federal program, convert to conventional, raise rents to market levels, or reap other financial rewards poses an immediate obstacle to the fulfillment of Congressional objectives embodied in the federal housing programs.

Two cases from the U.S. Court of Appeals for the First Circuit deal with the preemption of local rent control ordinances through HUD regulations. In *Kargman v. Sullivan*, 552 F.2d 2 (1st Cir.1977), the court held that a city rent control ordinance operated independently of the federal subsidized housing scheme and, therefore, was not automatically preempted. *Id.* at 13. With a different result, the court in *City of Boston v. Harris*, 619 F.2d 87 (1st Cir.1980) held that the city rent control ordinance directly conflicted with the HUD regulations for subsidized housing projects and was thus preempted. *Id.* at 94.

 The instant case presents a materially different fact pattern from these First Circuit cases. *Harris* and *Kargman* dealt with two, distinct pieces of rental rate legislation operating concurrently. In contrast, LARSO specifically exempts all projects under federal regulation from its operation up

to the point where federal subsidization is discontinued; thus, there is no direct conflict as the City of Los Angeles has conceded that part of the field to HUD. The preemption issue in the case at bar, however, concerns an interference with the expectations and purposes of the federal scheme rather than a direct conflict. Insofar as LARSO operates to prevent the owners from receiving the financing necessary to prepay and exit the federal program, it interferes with the federal scheme. Because the Los Angeles City Council tailored LARSO so narrowly around LIHPRHA, however, there is no direct conflict because the two governmental acts never act concurrently.

### B. Congressional intent to preempt

■ In determining whether federal law preempts state or local law, courts must give effect to the unambiguously expressed intent, purposes and objectives of Congress. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). Congress' original intent with respect to plaintiffs originally unfettered prepayment rights is manifested by LIHPRHA's express prohibition of any state or local law from restricting, inhibiting or otherwise interfering with the property owners' right to prepay their existing mortgage balances as of the 20 year prepayment date. LIHPRHA provides:

§ 4122. Preemption of State and local laws

(a) In general. No state or political subdivision of a state may establish, continue in effect, or enforce any law or regulation that—

(1) restricts or inhibits the prepayment of any mortgage described in section 229(1) [12 U.S.C.S. § 4119(1)] (or the voluntary termination of any insurance contract pursuant to section 229 of the National Housing Act [12 U.S.C.S. § 1715t]) on eligible low-income housing; ...

Any law, regulation, or restriction described under paragraph (1), (2), (3), or (4) shall be ineffective and any eligible low-

income housing exempt from the law, regulation, or restriction, only to the extent that it violates the provisions of this subsection.

12 U.S.C. § 4122(a). Congress' original intent is further confirmed by the report of the Committee on Banking, Finance and Urban Affairs, which states that 12 U.S.C. § 4122:

would preempt and declare null and void any state or local law, ordinance or regulation that limits an owner's right to pay off a mortgage on eligible low-income housing or, limits the occupancy, type of tenure, use or *rental charges* of such a property. The Committee wishes to emphasize that the preemption provision only applies to eligible housing, defined in the bill as projects with mortgages that are insured or assisted under the Section 221(d)(3)[ ] and Section 236 program. . . .

H.R.Rep. No.101–559, 101st Cong., 2d Sess., at 78(1990).

### C. Preemption of LARSO

■ Applying the third test for whether federal law preempts state law, the focus of the court's inquiry and mode of interpretation are whether the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Jones v. Rath Packing Co.* 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). This inquiry requires the court "to consider the relationship between state and federal laws as they are *interpreted and applied, not merely as they are written.*" *Jones,* 430 U.S. at 526, 97 S.Ct. at 1310 (emphasis added). Therefore, the analysis of LARSO's effect in the present case necessarily involves a consideration of how the ordinance operates as a matter of economic reality, rather than a mere examination of its text.

Plaintiffs' properties qualify as eligible low-income housing within the meaning of 12 U.S.C. § 4119 for the purposes of LIHPRHA's preemption provisions.[15] LARSO

---

**15.** Eligible low income housing is housing financed by a loan or mortgage that is "insured or

held by the Secretary and bears interest at a rate determined under the proviso of section

prevents affected low-income housing owners such as plaintiffs from charging market-level rents. This would have been true whether or not LIHPRHA was enacted. Without the cash flow from market rents, no lending institution will provide the plaintiffs with the financing necessary to prepay their mortgages. (*R.* at 244–45.) Far from accidentally, LARSO thus inhibits plaintiffs' ability to prepay their existing mortgage balances and to convert their properties to conventional. Moreover, although the terms of LARSO on their face take effect only after federal housing subsidization ceases, the on-going effect of LARSO is to interfere materially with the intent of the federal subsidized housing program. This interference with prepayment rights rather craftily attempts to circumvent the original intent of the federal program and is thus contrary to the expressed intent of Congress. *See* 12 U.S.C. §§ 4101(a), 4122. Defendant did not dispute this at trial or in its post-trial brief Rather, defendant claims that plaintiffs only argue that, but for the enactment of LIHPRHA, the property owners would have been able to prepay their mortgages. Defendant maintains that if plaintiffs wish to consider whether they could have prepaid their mortgages were it not for the government's breach, they must do so absent consideration of LIHPRHA and the preemption provision contained therein.[16] Therefore, argues defendant, plaintiffs' complete reliance on LIHPRHA's preemption provision is "without merit." Once plaintiffs start down that treacherous path, defendant contends, the die has been cast. Defendant would like to have its cake and eat it too.

The government's argument rings hollow, for even without LIHPRHA's section 4122(a) preemption provision, LARSO would nevertheless have interfered with plaintiffs' originally unfettered prepayment rights, contrary to Congressional intent. Specifically, defendant's argument is misguided for two reasons: (1) LARSO interferes with Congressional intent as embodied in the original contracts between plaintiffs, HUD, and the lending institutions, irrespective of LIHPRHA; (2) plaintiffs' consideration of prepayment in the absence of LIHPRHA is for the limited purposes of this litigation, i.e., quantifying their injury as a result of the government's breach. The properties at issue, as subsidized housing, all came into existence as federal program housing with the assistance or impedance of state or local laws. The moment LARSO was passed, it operated not only prospectively, but in effect it immediately sought to prohibit the owners from realizing the fruits of their bargain, i.e., the ability to raise rents to market levels. Ultimately, the facts are that: LARSO conflicts with the Congressionally stated intent of the original prepayment scheme; LIHPRHA was indeed enacted; and LIHPRHA breached the contracts with plaintiffs. The government must bear the consequences of its breach through enactment of LIHPRHA, i.e., federal preemption of LARSO. In measuring damages, the court takes the difference between the economic positions plaintiffs would have occupied with LIHPRHA and without LIHPRHA. Therefore, LARSO does not offset or bar plaintiffs' recovery of damages.

## V. The Court Adopts Plaintiffs' Damages Model.

As the court has noted several times above, plaintiffs' damages model relies on verifiable industry data to arrive at a dam-

17151(d)(5) of this title" or that is "insured, assisted, or held by the Secretary or a State or State agency under section 1715z–1 of this title." 12 U.S.C. § 4119(1)(A)(ii), (iii) (1994). Plaintiffs are participants in either the Section 221(d)(3) or Section 236 federal programs, and, as such, their developments are insured by the Secretary of HUD under 12 U.S.C. § 1715z–1.

**16.** The court notes that defendant never disputed that LARSO's prohibition of rent increases directly impacts plaintiffs' ability to prepay their existing mortgage balances and to convert the subject properties to conventional. Rather, defendant relies on the legal argument that plaintiffs cannot compare their state of affairs with and without LIHPRHA and its preemption provision. "Accordingly, [plaintiffs] cannot invoke LIHPRHA's preemption provision as a shield from the *effect of LARSO upon* prepayment and conversion of their properties to conventional rental income properties." *See Def's Post–Trial Brief* at 37–38. Indeed, this statement suggests that defendant does not dispute that LARSO interferes with plaintiffs' prepayment rights—plaintiffs' Congressionally intended prepayment rights.

ages calculation, whereas defendant's damages model relies too frequently on its own expert witness' subjective judgments and limited experience. Nonetheless, the court concludes that ultimately the parties' differing damages models do not necessarily generate a substantially different damages figure, provided that several troubling features of defendant's model are rectified. Once corrected for erroneous accounting and calculatory omissions, defendant's damages model yields an amount virtually identical to plaintiffs' model. (*R.* at 702–03.) This is further evidence to support the comprehensiveness and reliability of plaintiffs' damages model. Throughout the trial, it became apparent to the court that defendant's damages model charges plaintiffs with certain costs but fails to credit them with the attendant benefits, or vice versa. Also, defendant's damages model incorporates certain economic assumptions that have no basis in fact. With respect to some of these errors and omissions, defendant's economic expert reluctantly conceded that such treatment in the damages analysis was not economically valid.

## A. Errors

Defendant's damages model contains three significant errors, which render it less comprehensive and reliable than plaintiffs' model. Debt service calculation is a critical facet of both parties' damages models. As discussed above, plaintiffs' expert, Dr. Peiser, made the conservative assumption that plaintiffs would refinance only the amount needed to pay off the existing HUD mortgage plus points on the new mortgages. This resulted in a more conservative calculation. If plaintiffs had refinanced more than needed to repay their existing loans, the economic impact of the additional proceeds from such loans must be taken into account, i.e., there would be an offset of the reduction in operating cash flow and higher damages. Defendant would have the court treat the larger, proposed refinancing strictly as a cost without considering the attendant benefits. This flaw in defendant's model was recognized even by defendant's expert on cross-examination. *See supra* Section I.A.

Another error in defendant's damages model affects its treatment of HUD interest rate subsidies, payments made by HUD directly to the mortgage holders, the lending institutions rather than to the property owners, which effectively reduced the owner's debt service on the loans to below market rates. Interest subsidy payments were never made to the owners, nor did the properties receive any income therefrom. Despite this, however, one of defendant's experts erroneously imputed these subsidies as income to plaintiffs without taking into account that the corresponding interest must then likewise be imputed to the owners. The net effect of this analytical error was to impute income to plaintiffs they never received. Indeed, defendant's expert indicated that when applied to an analogous scenario, such accounting is economically incorrect. (*R.* at 693–94.) Lastly, defendant's expert charged the entire amount of the management fee paid by the property owners to their property manager although G & K is neither owned by plaintiffs nor distributes this amount to plaintiff properties as profit. Rather, the management fee is used to maintain building operations, pay employee salaries, and cover the costs of G & K's office expenses. (*R.* at 103–04.) It seems that defendant's expert merely assumed that management fees would be utilized solely as profit rather than to cover overhead.

## B. Omissions

Defendant's damages model also overlooks consideration of three economic factors. These omissions tend to reduce plaintiffs' damages under the government's economic analysis. Defendant's damages model fails to consider: (1) the impact of HUD's post-prepayment restrictions discussed *supra*, Section II; (2) the HELP Loans discussed, *supra*, Section III; and (3) the costs of converting to conventional. Conversion costs are the costs incurred when owners convert properties from HUD-restricted to market-rate status. Defendant's model does not consider the difference in conversion costs between the market-rate and no-interest HUD scenarios. (*R.* at 678–82). The significance of considering these costs is that plaintiffs incurred a benefit from deferring payment of

these expenses several years as a result of their compelled continuation in the HUD programs, during which time they were forbidden from converting to conventional. Plaintiffs' damages model subtracts HUD restricted conversion costs as of the original prepayment dates from market rate conversion costs as of the subsequent prepayment dates and attributes the difference as a benefit to plaintiffs under the HUD scenario. This is money they would have paid out but for the breach but did not have to pay until later as a result of the breach. This economic benefit to plaintiffs was not considered in defendant's income approach model even though it would have reduced defendant's calculations of plaintiffs' damages. While such accounting may prove slightly unfavorable to plaintiffs' damages figure, it lends great weight. to the thoroughness, reliability, and integrity of their damages model as a whole.

## C. The Expense of Processing Plans of Action

■■■■■ Defendant challenges the accuracy and reliability of plaintiffs' claims to the cost of processing POAs pursuant to 12 U.S.C. § 4107. These total costs of preparation and processing represent the sum of the variable costs and fixed legal/appraisal costs incurred in processing POAs under ELIHPA and LIHPRHA.[17] Defendant claims that plaintiffs are entitled to neither. The law is clear that legal expenses, whether characterized as breach damages or attorneys' fees, are only recoverable if they are the "natural and probable consequence" of defendant's breach, *Mega Constr. Co. v. United States,* 29 Fed.Cl. 396, 479 (1993), or awardable to a "prevailing party" under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d) (1985), respectively. This court and its predecessor have repeatedly held that even damages in the form of legal and consulting expenses incurred as a result of the government's breach are speculative and remote consequential damages, and as such, are not

awardable. *See Kania v. United States,* 227 Ct.Cl. 458, 650 F.2d 264, 269 (1981); *Cavanagh v. United States,* 12 Cl.Ct. 715, 719 (1987); *Albemarle Bank & Trust Co. v. United States,* 12 Cl.Ct. 704, 706–07 (1987); *Mazama Timber Prods., Inc. v. United States,* 6 Cl.Ct. 87, 90 (1984); *L'Enfant Plaza Props., Inc. v. United States,* 3 Cl.Ct. 582, 594 (1983).[18] Accordingly, legal/appraisal expenses, as consequential damages, are only recoverable to the extent that they were foreseeable at the time of contract formation, not at the time of the breach. *Lucas v. United States,* 25 Cl.Ct. 298, 310 (1992). The determination of whether consequential damages were foreseeable at the time of formation such that they are the natural and probable consequence of the breach is a factual inquiry. *Smokey Bear Inc. v. United States,* 31 Fed.Cl. 805, 809 (1994).

### 1. Variable costs

■■■■ The claimed variable costs, according to defendant, are unreasonable for several reasons. First, defendant takes issue with the numeric computation of these costs as 2% of the preservation equity for each project, i.e., the difference between each property's fair market value and the existing, HUD-insured, mortgage balance. Second, defendant claims that plaintiffs have not adequately substantiated these costs and have failed to produce any accurate written record of the costs and itemization of these services. Third, defendant argues that it is not clear whether plaintiffs actually paid for these services. Upon review of the testimony and supporting documentation entered into evidence by plaintiffs at trial, the court agrees with defendant's rejection of the variable costs. *See PX 201–04, Schedule B(7).* These documents set forth a general explanation of the costs associated with processing a POA pursuant to HUD's program. For example, a June 24, 1993 memorandum found at n. 44 prepared by Boston Financial Asset Manage-

---

17. The total costs of processing POAs for each of the subject properties is: $128,836 for Sherman; $62,669 for Independence; $141,130 for St. Andrews; and $27,122 for Pico Plaza.

18. The legal expenses cited in these precedents dealt with the costs of litigating separate, unrelated lawsuits correlated to—but not caused by—the breach or covering the indirect costs and effects of the breach.

ment, a division of The Boston Financial Group, explains:

> There is a complex time consuming process involved with achieving the benefits of the program. It begins with a valuation and concludes with HUD's approval and funding of a Plan of Action. To gain HUD approval, the programmatic submissions exceed the normal duties of the General Partner to conduct the affairs of the Partnership.... The consent of the Limited Partners is herewith requested for the payment of a total processing fee that will equal 2% of the Preservation Equity, with a minimum fee of $50,000 and a maximum fee of $100,000. (Preservation Equity is defined in the HUD program as market value less the HUD mortgage balance.) Thus the amount of the fee will vary with the value that HUD eventually attributes to the property.

*Id.* (emphasis omitted); *see also* 12 U.S.C. § 4107(b)(1). Pursuant to the agreements, Boston Financial was to receive 20% of the total processing fee—i.e., 0.4% of the Preservation Equity—and this fee was to be paid for services rendered "upon closing of the transaction. *Payment of the fee [was to] thus occur at the time when distribution of proceeds is made to the limited partners.*" *Id.* (emphasis added); *see also* 12 U.S.C. § 4107(b)(1).

Plaintiffs thus claim that their decision to prepare and process their POAs came as the result of a statutory directive to do so. According to plaintiffs, the owners had no choice but to incur these costs to comply with LIHPRHA's requirements, regardless of whether plaintiffs wished to: prepay the existing mortgage balances and terminate the affordability restrictions; extend the affordability restrictions by requesting incentives; or sell the property to a buyer who would agree to maintain the affordability restrictions. *See* 12 U.S.C. § 4107(a)(1). In other words, plaintiffs argue that expenditure of these costs was the natural and inevitable result of the breach, since LIHPRHA itself mandated that plaintiffs prepare the required POAs in order to prepay their existing mortgage balances.

Even though the claimed variable costs are not attorneys' fees arising from litigation per se, this court and its predecessor have rejected similar consulting expenses incurred as an unforseen result of breach of contract. The court feels that these variable costs were neither within the parties' actual contemplation at the time of formation nor the direct and inevitable result of defendant's breach. Whereas plaintiffs could have foreseen that the government would not fulfill its contractual obligations in light of plaintiffs' economic expectations, plaintiffs were not coerced by defendant to submit POAs pursuant to LIHPRHA. Further, plaintiffs have not established a rational basis for the amount of variable legal expenses based upon an assigned relationship to the properties' preservation equity. The court, therefore, concludes that expenditure of these variable costs was unforeseen and remote, and as such, are not awardable as consequential damages. Indeed, two of the four model properties have not even incurred these expenses yet. Accordingly, plaintiffs' damages figure shall be adjusted downward by the amount of variable costs.

### 2. Fixed Legal/Appraisal Costs

█ Plaintiffs also seek compensation for the fixed legal/appraisal expenses associated with the preparation and processing of their POAs. This amount is $16,000 per property, which represents a fixed $10,000 amount for legal costs and a fixed $6,000 amount for appraisal costs. Defendant challenges the amount for legal costs on two bases: (1) there is no statutory authority for an award of attorneys' fees in this context; and (2) such legal/appraisal costs constitute consequential damages, which are rarely recoverable against the United States. While it is well-settled that attorneys' fees arising from litigation may only be awarded in this court pursuant to EAJA, 28 U.S.C. § 2412(d), upon motion by the prevailing party after entry of final judgment, it is a separate issue whether legal/appraisal costs that, in part, give rise to litigation are awardable. In this case, plaintiffs claim that they had to retain legal counsel and appraisal experts to assist in the preparation and processing of their POAs to comply with LIHPRHA. Thus, claim plaintiffs, their legal/appraisal expenses flow from

the breach itself rather than the litigation of the breach.

It is clear that plaintiffs' claimed fixed legal/appraisal costs are not attorneys' fees arising out of the instant or other litigation. Nevertheless, the court notes that, in fact, these fixed costs are even more speculative than the variable costs discussed above. *A fortiori*, the court looks upon *fixed* costs questionably, especially since plaintiffs have neither explained the fixed nature of these costs nor revealed how the work covered by these fixed costs differed from the work covered by the variable costs. Nor have plaintiffs substantiated the relation of the fixed costs to the nature of the work performed. This court cannot conclude from the record, therefore, that incurrence of the fixed costs was contemplated by the parties insofar as they were the natural and probable consequence of the breach. Rather, the court concludes that expenditure of fixed legal/appraisal costs was also unforeseen at the time of contract formation and remote, and as such, are not awardable as consequential damages either. Accordingly, plaintiffs' damages figure shall also be reduced by the amount of fixed legal/appraisal expenses, $16,000 per plaintiff, used to prepare and process their POAs.

### Conclusion

Plaintiffs' damages model is comprehensive, reliable, and based on objective, verifiable HUD and industry data. In contrast, defendant's economic model is subjective and plagued by admitted errors, material omissions, and incorrect assumptions. Whereas plaintiffs' damages model can easily be applied to the remaining litigation, defendant's model would almost certainly require individualized judgment calls and mire the court and the parties in 38 additional, costly evidentiary and valuation hearings for the non-model plaintiffs in this phase of the case. Accordingly, after careful consideration of the arguments, testimony, exhibits, and applicable law, the court adopts plaintiffs' damages model with the limited exceptions discussed *supra*, Section V.C., and concludes that plaintiffs are entitled to damages in the amount of $3,061,107 [19] for the four model properties.

---

19. This figure represents the original amount of claimed damages ($3,420,864) less the sum of the variable and the fixed legal/appraisal costs of the four model properties ($359,757).